890 F.2d 594
 13 U.S.P.Q.2d 1125
 WILLIAM WRIGLEY JR. COMPANY, Plaintiff-Appellee, Cross-Appellant,
v.
Eric WATERS, Eric Waters d/b/a Haseltine, Lake & Waters,
HLW-Patent Service, Co., Inc., HLW-Waters Service Co., Inc.,
Glenn Waters, and Glenn Waters d/b/a Haseltine, Lake and
Waters and d/b/a Haseltine & Lake, Defendants-Appellants,
Cross-Appellees.
 No. 1306, Dockets 88-7069, 88-7289.
 United States Court of Appeals,
Second Circuit.
 Argued July 18, 1988.
Decided Nov. 28, 1989.
 
 James M. Leonard, New York City (Leonard, Kenny & Stearns, New York City), for defendants-appellants, cross-appellees.
 Jonathan H. Hines, New York City (Debevoise & Plimpton, New York City, Anthony H. Handal, Handal & Morofsky, Norwalk, Conn., of counsel), for plaintiff-appellee, cross-appellant.
 Before ALTIMARI and MAHONEY, Circuit Judges, and DEARIE, District Judge.*
 DEARIE, District Judge:
 Defendants-appellants and cross-appellees Eric Waters, Eric Waters d/b/a Haseltine, Lake & Waters, HLW Patent Service Co., Inc., and HLW-Waters Service Co., Inc., appeal from a judgment of the United States District Court for the Southern District of New York, Charles E. Stewart, Judge, entered following a non-jury trial, awarding plaintiff-appellee, cross-appellant William Wrigley Jr. Company damages in the amount of $135,429.33, plus interest, for the negligent performance of services and breach of contract by defendants-appellants, cross-appellees in connection with their role as Wrigley's trademark agents. Wrigley cross-appeals, challenging the district court's refusal to award one element of damages and the denial of punitive damages. The district court's opinion is reported at 5 U.S.P.Q.2d 1741 (S.D.N.Y.1987).
 We consider now defendants-appellants' contentions that the district court erred in imposing a constructive trust with respect to damages assessed against them in favor of certain non-parties to this lawsuit, that the district court improperly pierced the corporate veil in imposing personal liability on Eric Waters, and that the court wrongfully awarded damages to Wrigley for "clean-up" costs. We affirm, reverse in part, and remand.
 I. BACKGROUND
 Plaintiff-appellee and cross-appellant, William Wrigley Jr. Company ("Wrigley"), is a corporation engaged in the business of selling numerous brands of chewing gum throughout the world under familiar trade names. During the relevant period, Wrigley, through various agents, actively protected its trademarks which are registered in over 153 countries where those products are distributed. Defendant Eric Waters ("Waters") is a trademark and patent agent who conducted business between 1977 and 1979 as a sole proprietorship, Haseltine, Lake & Waters. On June 22, 1979, Waters sold his trademark registration business but continued to do business as a trademark renewal specialist under the names HLW Patent Service Co., Inc. and later HLW-Waters Service Co., Inc. (collectively "defendants").[1]
 This dispute concerns a once harmonious business relationship turned sour. From 1973 to early 1981 defendants were responsible for renewing approximately 3500 Wrigley trademark registrations worldwide. During that time Wrigley relied on defendants to ensure that its trademarks would continue to be protected. The process of renewing trademarks varies greatly from one foreign country to another. In the normal course, upon confirming that Wrigley wished to renew a particular trademark in a certain foreign country, defendants would retain a law firm or other trademark specialist in that country (the "foreign associate") to process the paperwork necessary to effect the renewal. The appropriate renewal forms and other required documentation were typically prepared and forwarded to the appropriate foreign associate by defendants.
 Once this work was completed, defendants would periodically send Wrigley invoices, known as debit notes, which stated the amount Wrigley owed for the services performed by both the foreign associate and defendants. These debit notes listed only one amount, labelled "services and disbursements," but did not itemize the amounts attributable to the defendants' and the foreign associates' services.
 In 1980, as part of a company plan to reduce costs and improve operational efficiency, Wrigley decided to discontinue use of outside trademark agents and instead to manage its trademarks in house. Wrigley hired Jacqueline Hill, an experienced trademark agent and former employee of defendants, and promptly wrote defendants and then the foreign associates to apprise them of the company's plans. Wrigley announced that it planned a gradual transition and solicited everyone's guidance and cooperation.
 A number of the foreign associates responded to the announcement by advising Wrigley that they had not been paid by defendants for work performed on Wrigley's behalf. Wrigley was sensitive to the importance of maintaining good relationships with the foreign associates on whom it would continue to rely. The company also grew concerned about its then pending trademark renewal applications in the hands of the defendants. With these concerns in mind, Wrigley dispatched Hill to defendants' offices in New York. This trip and the events that followed marked a turning point in the relationship of the parties.
 Upon her arrival in New York, Hill sought to determine the precise status of the pending renewal applications. Her review of defendants' work files was alarming. She found much of the information incomplete and inaccurate and in many cases simply unverifiable. Some files were missing. Her concerns intensified when her request to examine the original trademark documents to ascertain reliably the status of pending renewals was met with the response that those critical documents had been placed in storage in a warehouse.
 Hill's preliminary review of defendants' limited documentation convinced her that she should not return to Wrigley's offices in Chicago without all the trademark files. She made her way to the warehouse, paid overdue storage charges and made arrangements to ship all the files to Chicago.
 Wrigley's original plan for a gradual, orderly transition had to be abandoned. With Hill back in Chicago, there followed a mad scramble to review and, in many cases, reconstruct over 3500 files. Trademark renewals had to be verified. Critical documents and correspondence had to be located or recreated. All in all, Hill and others devoted countless hours to the painstaking process of restoring Wrigley's trademark files. This so-called "clean-up" work revealed a number of specific problems. Trademarks had lapsed. Others, about to lapse, were salvaged only by Hill's desperate, last minute efforts.
 Wrigley's review and reconstruction of the files also revealed defective renewals and other costly problems occasioned by defendants' inattention. For example, defendants had arranged and supervised the attempted assignment of trademarks under Egyptian law. Wrigley's review of the files revealed that the assignment was prohibited under Egyptian law. Finally, Wrigley discovered that defendants also failed to maintain current records with respect to those countries which required newly-executed powers of attorney for each renewal. In this regard, defendants had required Wrigley to execute two new powers of attorney for every renewal that was filed. This procedure, however, was in many instances unnecessary and allegedly resulted in needless expense for Wrigley.
 Wrigley commenced this action in June 1982 alleging that defendants had breached their duty of care as Wrigley's agents and were liable for negligent performance of services and breach of contract. Wrigley claimed extensive damages. First, Wrigley sought "clean-up" damages for expenses incurred in putting the trademark segment of its business back in order. This included processing renewals of trademarks neglected by defendants, correction of other inaccuracies with respect to several trademarks, and the reconstruction and replacement of trademark files lost while in defendants' possession. Second, Wrigley sought damages for the unnecessary signatures and seals defendants required Wrigley to provide in connection with the powers of attorneys that defendants caused Wrigley to sign.
 Wrigley also requested the costs incurred due to lost registrations, that is, the costs of filing new registrations because of defendants' failure to make timely renewals. Wrigley claimed damages stemming from the Egyptian error (where it was wrongly advised on the assignment question), damages for excessive billing for renewals from July 1978 through December 1980, and an improper charge for pending renewals for February to June 1981. Finally, Wrigley sought the return of $30,811.77 paid to defendants for foreign associates' services and improperly retained by Waters.
 Following an eleven day non-jury trial, the district court concluded that the defendants were liable to Wrigley for both negligent performance of services and breach of contract. Judge Stewart awarded Wrigley $135,429.33 plus interest in sustaining the bulk of Wrigley's damage claims. In making the damage award, the district court apportioned the amounts as follows:
 1. Clean up $ 66,150.44
2. Costs of lost registrations 16,000.00
3. Egyptian error 3,711.90
4. Excessive billing 11,255.12
5. Charge for pending renewals 7,500.00
6. Unpaid debit notes 30,811.77
 -----------
 $135,429.23
 5 U.S.P.Q.2d at 1745.
 With respect to the damages awarded for the unpaid foreign associate debit notes, the district court imposed a constructive trust requiring Wrigley to distribute those funds to the appropriate foreign associates under the court's supervision. The district court did not award Wrigley damages for the powers of attorney mistakenly required by defendants and refused to award punitive damages or sanctions. This appeal and cross-appeal followed.
 As might be expected, the principal witness at trial was Jacqueline Hill. She testified for eight days, including four days of vigorous cross-examination. The district court chose to credit her testimony, a conclusion amply supported in the trial record. Indeed, much of her testimony, as well as the balance of Wrigley's case, was not seriously disputed. As the ensuing discussion demonstrates, to the extent factual disputes continue to linger on this appeal, we conclude, with one exception, that the District Court's findings easily satisfy the clearly erroneous standard.
 II. DISCUSSION
 Defendants raise numerous issues on this appeal. We consider here defendants' contentions that the district court erred in imposing a constructive trust, that the court improperly pierced the corporate veil in imposing personal liability on defendant Eric Waters, and wrongfully awarded Wrigley damages for clean-up costs.
 A. CONSTRUCTIVE TRUST
 Defendants argue that the district court's imposition of a constructive trust on Wrigley lacks any factual or legal basis. The district court found that defendants were liable to Wrigley in contract and quasi-contract for failing to transmit to the foreign associates funds provided by Wrigley. The district court ordered those funds returned to Wrigley and then imposed a constructive trust on Wrigley to insure that the foreign associates would be paid. Although presented as a challenge to the district court's use of a constructive trust, defendants' principal assertion is that the evidence did not demonstrate that they owed the foreign associates any outstanding payments. The record, however, including extracts from defendants' own files as well as detailed documentation from the foreign associates, overwhelmingly belies this argument.
 We begin in November 1980, when a Columbian associate first notified Wrigley by letter that defendants were long overdue in paying for the associate's services with respect to Wrigley's trademark renewals. Reacting with understandable concern, Wrigley then canvassed other foreign associates who had provided services for Wrigley. Many responded that they too had not been paid for work done on behalf of Wrigley at the behest of defendants. In addition, Hill testified that she confronted Glenn Waters about the unpaid debit notes, and that Waters acknowledged on a number of occasions that the foreign associates had not been paid. According to Hill, Waters occasionally cited cash flow problems as the explanation, but at other times he simply claimed he did not know why the notes remained unpaid. The majority of the debit notes were not paid. Moreover, a report prepared by defendants' own accountants confirmed the existence of substantial outstanding foreign associate debit notes.
 Defendants attempted at trial to rebut the documentary evidence by arguing that Waters' testimony that the accounts had been paid in full was credible. Obviously, the district court decided, with good reason, not to credit Waters' testimony in the face of the rather extensive showing made by Wrigley to the contrary. In sum, the district court's finding that many of the foreign associates had not been paid the amount stated was not clearly erroneous.
 Defendants next claim that there is no evidence in the record to support the conclusion that there was an express or an implied promise by them to pass on any monies to the foreign associates. They argue that Wrigley can point to no contract obligating them to such a duty. We disagree.
 Although there was no written contract between the parties, it is undisputed that Wrigley was billed both for the defendants' services and for those rendered by the foreign associates at the request of defendants and on behalf of Wrigley. Unassailable documentary evidence demonstrates that in the normal course defendants remitted the allocable portion of Wrigley's payments to the foreign associates. As a practical matter defendants were Wrigley's agents. Acting as such, they retained foreign associates to provide services to Wrigley. Indeed, it is at least arguable that the foreign associates could very well have sought payment from Wrigley as a disclosed principal--a fact to which Wrigley and Hill were apparently sensitive. It is clear that the agreement of the parties contemplated that Wrigley would pay defendants for these services and defendants, as Wrigley's agents, would in turn remit the appropriate fees. Defendants' claim to the contrary was properly rejected by the district court.
 In determining that a constructive trust should be imposed the district court concluded:
 Defendants assert, however, that they are not liable to Wrigley for its claim of $30,811.77 for unpaid foreign associates debit notes, on the ground that only the foreign associates can recover these amounts. However, the latter are as a practical matter in no position to obtain recovery of these amounts; moreover, Wrigley has consistently taken the position that it seeks recovery of these amounts not for itself, but for the foreign associates, and is prepared to assume a constructive trust for such payment, Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 521 F.Supp. 118, 126 (S.D.N.Y.1981), modified in other part, 691 F.2d 1039 (2d Cir.1982), cert. denied, 460 U.S. [1012, 103 S.Ct. 1253, 75 L.Ed.2d 482] (1983); see 5 Scott, The Law of Trusts Sec. 462.2 at 3418 (3d ed. 1967 & 1986 Supp).
 5 U.S.P.Q.2d at 1744 (footnote omitted). We agree that the use of a constructive trust was entirely proper in light of the evidence contained in the record.
 This Court has recently summarized the relevant New York law, which governs in this diversity action, on constructive trusts:
 " 'A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.' " Simonds v. Simonds, 45 N.Y.2d 233, 241, 380 N.E.2d 189, 193, 408 N.Y.S.2d 359, 363 (1978) (quoting Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919) (Cardozo, J.)).
 
 
 1
 To be entitled to a constructive trust under New York law, a party must establish four elements: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment. Bankers Security Life Insurance Society v. Shakerdge, 49 N.Y.2d 939, 406 N.E.2d 440 , 428 N.Y.S.2d 623, 624 (1980); Sharp v. Kosmalski, 40 N.Y.2d 119, 121, 351 N.E.2d 721, 723, 386 N.Y.S.2d 72, 75 (1976).
 
 
 2
 Brand v. Brand, 811 F.2d 74, 77 (2d Cir.1987); see Republic of Philippines v. Marcos, 806 F.2d 344, 355 (2d Cir.1986), cert. denied, 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987); United States v. Rivieccio, 661 F.Supp. 281, 291-93 (E.D.N.Y.1987).
 
 
 3
 It should be noted that although these factors may be used as guidelines, in many cases a constructive trust may be imposed without strict adherence to these factors. See Simonds v. Simonds, 45 N.Y.2d 233, 241, 380 N.E.2d 189, 194, 408 N.Y.S.2d 359, 363 (1978); see Rivieccio, 661 F.Supp. at 292 ("[t]he four elements enumerated in Brand are not talismanic") (citing Coco v. Coco, 107 A.D.2d 21, 24, 485 N.Y.S.2d 286, 289 (2d Dep't), appeal dismissed, 65 N.Y.2d 637 (1985); Reiner v. Reiner, 100 A.D.2d 872, 874, 474 N.Y.S.2d 538, 541 (2d Dep't 1984) (per curiam )). It is an equitable remedy that will be imposed " 'whenever necessary to satisfy the demands of justice ... [I]ts applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them.' " Simonds, 45 N.Y.2d at 241, 380 N.E.2d 189, 408 N.Y.S.2d 359 (quoting Latham v. Father Divine, 299 N.Y. 22, 27, 85 N.E.2d 168, 170 (1949)).
 
 
 4
 We recognize, as defendants argue, that this case may not involve a classic application of the concept of constructive trust. The district court might well have imposed a constructive trust on defendants, making far more relevant the protracted and misguided legal attack on Judge Stewart's use of the constructive trust. The fact is that once the district court concluded that Wrigley was entitled to the return of the funds in question, defendants should hardly be heard to complain about the disposition of those funds by the court and Wrigley. Wrigley was not, as defendants suggest, a "gratuitous interloper" when it expressed its willingness to assume a constructive trust. Wrigley had a pronounced interest in seeing that these unpaid amounts, wrongfully withheld by defendants, be identified and collected so that the aggrieved foreign associates would ultimately recover the outstanding payments. See generally 5 Scott, supra, Secs. 471, 471.1 at 3447-48 (suggesting that property wrongfully obtained by transferee from transferor, where transferor owes duty to third person, may be held in constructive trust in favor of transferor). It is clear that the law has provided a variety of avenues of redress for the circumstances presented here and we are persuaded that Judge Stewart chose an appropriate one.
 
 B. PIERCING THE CORPORATE VEIL
 
 5
 Defendants contend that the trial court erroneously found that defendant corporations HLW Patent Service Co., Inc. and HLW-Waters Service Co. were the alter egos of defendant Eric Waters and that Waters was thereby jointly and severally liable with each of the corporate defendants. Defendants simply argue that the evidence does not support such a finding. We agree.
 
 
 6
 It is well settled that New York courts are reluctant to disregard the corporate entity. See Puma Indus. Consulting, Inc. v. Daal Associates, Inc., 808 F.2d 982, 986 (2d Cir.1987); Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir.1979); Wang Laboratories, Inc. v. Dataword Corp., 680 F.Supp. 110, 111 (S.D.N.Y.1988) (quoting Gartner, 607 F.2d at 586); Billy v. Consolidated Mach. Tool Corp., 51 N.Y.2d 152, 163, 412 N.E.2d 934, 941, 432 N.Y.S.2d 879, 886 (1980); Port Chester Elec. Const. Co. v. Atlas, 40 N.Y.2d 652, 656, 357 N.E.2d 983, 986, 389 N.Y.S.2d 327, 331 (1976); Rapid Tr. Subway Constr. Co. v. City of New York, 259 N.Y. 472, 487-88, 182 N.E. 145, 145-50 (1932); see also Henn & Alexander, Laws of Corporations and Other Business Enterprises, Sec. 146 at 346 n. 10 (3d ed. 1983) (characterizing New York courts as "recognizers of corporateness") (hereinafter "Henn & Alexander"). Indeed, New York "allows individuals to incorporate for the very purpose of avoiding personal liability." Gartner, 607 F.2d at 586 (citing Bartle v. Home Owners Cooperative, 309 N.Y. 103, 127 N.E.2d 832 (1955)); see Walkovazky v. Carlton, 18 N.Y.2d 414, 417, 223 N.E.2d 6, 8, 276 N.Y.S.2d 585, 587 (1966); Trenga Realty v. Tiseo, 117 A.D.2d 951, 499 N.Y.S.2d 262, 264 (3d Dep't 1986).
 
 
 7
 Thus, the corporate veil will be pierced only when it can be demonstrated that the "[corporate] form has been used to achieve fraud, or when the corporation has been so dominated by an individual ... and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego." Gartner, 607 F.2d at 586; see Dow Chemical Pacific, Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 342 (2d Cir.1986); Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir.1980). A court may consider several factors in making this determination:
 
 
 8
 (1) the intermingling of corporate and personal funds, Walkovszky v. Carlton, supra; (2) undercapitalization of the corporation, Gartner v. Snyder, 607 F.2d 582 (2d Cir.1979); and (3) failure to maintain separate books and records or other formal legal requirements for the corporation, D.C. Auld Company v. Park Electrochemical Corporation, 553 F.Supp. 804 (E.D.N.Y.1982). While there is no set rule as to how many of these factors must be present in order to pierce the corporate veil, the general principle followed by the courts has been that liability is imposed when doing so would achieve an equitable result. Brunswick Corporation v. Waxman, 599 F.2d 34, 35 (2d Cir.1979).
 
 
 9
 A/S Domino Mobler v. Braverman, 669 F.Supp. 592, 594 (S.D.N.Y.1987). Additional factors have been considered as well. For example, failure to pay dividends, insolvency at the time of a transaction, siphoning of corporate funds by the dominant shareholder and nonfunctioning of other officers and directors, either individually or in combination, may evidence a corporation that is a mere shell and therefore susceptible to being bypassed in fashioning an appropriate remedy. See Henn & Alexander Sec. 146 at 347 n. 18.
 
 
 10
 Application of these many precedents to the literally infinite variety of situations which might warrant a court to pierce the corporate veil can be difficult, particularly in the case of small privately held corporations where the trappings of sophisticated corporate life are rarely present. In such instances, preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history would inevitably beckon the end of limited liability for small business owners, many, if not most, of whom have chosen the corporate form to shield themselves from unlimited liability and potential financial ruin. Nevertheless, a close examination of the many cases reveals common characteristics broadly utilized by reviewing courts in deciding whether to disregard the corporate form. In each case, the evidence demonstrated an abuse of that form either through on-going fraudulent activities of a principal, or a pronounced and intimate commingling of identities of the corporation and its principal or principals, which prompted the reviewing courts, driven by equity, to disregard the corporate form.
 
 
 11
 In this action, the district court concluded simply:
 
 
 12
 Since Eric Waters conducted his business through various alter egos including Haseltine, Lake & Waters, HLW Patent Service Co., Inc. and HLW-Waters Service Co. we hold that he is jointly and severally liable with each of these organizations.
 
 
 13
 5 U.S.P.Q.2d at 1745.
 
 
 14
 We are unable to isolate any evidence which warrants, in our view, the district court's decision to pierce the corporate veil and impose personal liability on Eric Waters. Indeed, our review of the record, including the pleadings, trial transcript and post-trial submissions, suggests that the issue was barely the focus of the court's or the litigants' attention and was apparently only broached in Wrigley's Responsive Post-Trial Memorandum. We conclude that the district court's finding was clearly erroneous in this regard.[2]
 
 
 15
 Although we are constrained to disagree with the district court's decision to pierce the corporate veil, we recognize that it may be otherwise appropriate to impose personal liability on Eric Waters for all or some of the damages awarded. For example, the evidence shows, and the district court found, that in 1978--long before Waters incorporated--he erroneously advised Wrigley concerning assignments of trademarks under Egyptian law. Other evidence in the record suggests that some of the problems Wrigley fortuitously discovered in 1980 and 1981 may in fact be traceable to the period of Waters's sole proprietorship. It is apparent, therefore, that a precise assessment of Waters's personal liability will require a remand to the district court for possible additional findings.
 
 C. CLEAN-UP COSTS
 
 16
 Defendants argue that the district court's award of clean-up costs to Wrigley was error. Specifically, they claim that there was no contractual obligation on their behalf that warrants any imposition of liability in this regard. Alternatively, defendants contend that the district court's findings as to the amount of damages awarded were clearly erroneous. These arguments are unpersuasive.
 
 
 17
 We noted earlier that this component of damages awarded by the district court, clean-up costs, primarily pertains to work done by Hill and others at Wrigley to rectify the unacceptable position Wrigley found itself in when it attempted to take the trademark renewal business in house. As the district court stated:
 
 
 18
 It included the processing of renewals neglected by defendants, the correction of inaccuracies and misfilings in the file turned over to Wrigley, and the reconstruction and replacement of files which had been lost. As a result, Hill and others were engaged in substantial extra work. Also, Hill was unable to turn to the work for which she was hired (trademark renewals) for almost two years. As a result, plaintiff had to hire another trademark agent to perform this function during that period.
 
 
 19
 5 U.S.P.Q.2d at 1743. Accordingly, the district court awarded Wrigley $66,150.44 to cover these expenditures, holding defendants liable to Wrigley on alternative theories of tort for the negligent performance of services, as well as in contract. See 5 U.S.P.Q.2d at 1744-45.
 
 
 20
 It is well settled under New York law that negligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract, see Ajax Hardware Mfg. v. Industrial Plants Corp., 569 F.2d 181, 185 (2d Cir.1977) (citing Prosser, The Law of Torts, Sec. 92 (4th ed. 1971); Restatement (Second) of Torts Secs. 323, 324A (1965)), which may be submitted to the trier of the case alternatively. See Ajax Hardware Mfg., 569 F.2d at 185; Victorson v. Bock Laundry Machine Co., 37 N.Y.2d 395, 335 N.E.2d 275, 373 N.Y.S.2d 39 (1975); Fed.R.Civ.P. 8(e)(2). Such a cause of action has been described as follows:
 
 
 21
 Where a person contracts to do certain work he is charged with the common law duty of exercising reasonable care and skill in the performance of the work required to be done by the contract. It is the breach of the duty imposed by law and not of the contract obligation which constitutes the tort.
 
 
 22
 Rosenbaum v. Branster Realty Corp., 276 A.D. 167, 168, 93 N.Y.S.2d 209, 211 (1st Dept.1949); see Consolidated Edison Corp. v. Westinghouse Elec. Corp., 567 F.Supp. 358, 364 (S.D.N.Y.1983); Robbins v. Ogden Corp., 490 F.Supp. 801, 806-07 (S.D.N.Y.1980); Republic Corp. v. Procedyne Corp., 401 F.Supp. 1061, 1070 (S.D.N.Y.1975); Shubitz v. Consolidated Edison Co., 59 Misc.2d 732, 301 N.Y.S.2d 926, 930 (Sup.Ct.Kings Cty.1969). We agree with the district court that because defendants held themselves out as experts in trademark law and undertook to protect some 3,500 of Wrigley's trademarks, they were required to act with due care and thus their liability arises out of a duty imposed by law. It is well established that the appropriate standard of due care in such cases is "the care and caution proper to [their] calling." Ultramares Corp. v. Touche, Niven & Co., 255 N.Y. 170, 179, 174 N.E. 441, 448 (1931); see Bamert v. Central General Hospital, 77 A.D.2d 559, 559-60, 430 N.Y.S.2d 336, 337 (2d Dept.1980), aff'd mem., 53 N.Y.2d 656, 421 N.E.2d 119, 438 N.Y.S.2d 999 (1981); see also Caldwell v. Bechtel, Inc., 631 F.2d 989, 997 (D.C.Cir.1980).
 
 
 23
 Here, the uncontradicted testimony established that the trademark registration renewal business necessitates precision, careful attention and strict adherence to the legal requirements of numerous foreign jurisdictions. Running afoul of such standards means risking a defective or untimely registration which translates into potentially disastrous consequences. Thus, there is an obligation on behalf of experts such as defendants to maintain files that are scrupulously accurate, up to date and complete. Moreover, barring some explicit understanding to the contrary, it is patently reasonable to impose upon such specialized service personnel the duty to maintain, in an appropriate format, retrievable information for possible use by the client in the event the relationship is for whatever reason terminated. Accordingly, under these circumstances, the district court quite properly concluded that defendants had the duty to meet these standards in effecting renewals promptly and maintaining appropriate and orderly files in an effort to do so. See Havas v. Victory Paper Stock Co., Inc., 49 N.Y.2d 381, 385-86, 402 N.E.2d 1136, 1138, 426 N.Y.S.2d 233, 236 (1980).
 
 
 24
 Defendants also contend that some of the clean-up costs awarded by the district court were unjustified. They are especially concerned with that amount attributable to the salary of an additional employee hired by Wrigley during the clean-up process. Once again, however, there is ample support in the record for the damages awarded.
 
 
 25
 The record reflects that in November 1980, Wrigley decided that it would gradually take the trademark renewal business in house. When it notified the foreign associates of its decision to do so, Wrigley soon found out that there were a number of problems that it could not have anticipated. Further investigation by Hill in November 1980 confirmed that registration renewals were being badly mishandled and foreign associate payments were being withheld. Of particular concern to Hill at that time were renewals not yet completed by defendants.
 
 
 26
 Accordingly, Hill travelled to defendants' New York offices in January 1981, in order to ascertain the status of the pending renewals. Upon discovering that the files were in total disarray, Hill arranged for their removal and shipment to Chicago. When she returned, Hill concluded that Wrigley should immediately take over the entire renewal business.
 
 
 27
 During the period from November 1980 through early 1982, Wrigley was required to divert substantial resources to the clean-up task in an effort to protect its very valuable trademarks.[3] Wrigley had to quickly process renewals which defendants had neglected even though the due dates were only weeks away. Its confidence shaken, Wrigley had to review every one of its 3,500 trademark files. Wrigley expended much time and energy in putting its house back in order. Hill could not assume the duties she had been hired to perform, forcing Wrigley to hire another person to assume those responsibilities.
 
 
 28
 We conclude that the district court's award of damages was proper. It is axiomatic that the purpose of compensatory damages is to replace the loss directly and proximately caused by a party's breach of contract or tortious conduct. It is an equally fundamental principle that reasonable expenses, including overhead expenses, incurred as a result of a breach of contract or a tortious act are proper items of recoverable damages. See generally 36 N.Y.Jur.2d Secs. 7-9, 87-89 (and authorities there cited); "Overhead Expense as Recoverable Element of Damages," 3 A.L.R.3d 689. In short, the district court's award[4] adequately reflected the extra expense incurred by Wrigley due to defendants' negligence.
 
 
 29
 We have considered defendants' other arguments as well as Wrigley's claims on its cross-appeal and find them to be without merit.
 
 III. CONCLUSION
 
 30
 We reverse that portion of the judgment that holds Eric Waters jointly and severally liable and remand to the district court for further proceedings. The judgment is in all other respects affirmed.
 
 
 31
 Review of 200 pending renewals. $ 1,377.50
Processing of 100 Certificates of Renewal. 688.75
Review of 103 files re pending renewals. 1,418.82
Organization of 3,500 case files and 200-300 renewal files per 16,530.00
 year.
Time and expenses with respect to trip to New York City to retrieve 1,276.28
 Wrigley files.
Correspondence with foreign associates to determine amount of 1,033.26
 unpaid debit notes.
Correlating foreign associates' unpaid debit notes with defendants' 1,033.12
 debit notes paid by Wrigley.
Correlating billings of the above with defendants' monthly 1,033.12
 statements and Wrigley checks paying same.
Photocopying expenses with respect to above items. 500.00
Telephone, telex, etc. expense. 500.00
Management time associated with the above. 7,000.00
Support staff time. 500.00
Controller's Department time. 750.00
Treasurer's Department time. 750.00
Overhead equal to salary. 31,759.09
 ----------
 $66,149.94
 
 
 
 *
 The Honorable Raymond J. Dearie, United States District Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 Glenn Waters, Eric Waters' son, and related entities were named defendants below. The district court dismissed the complaint as to these parties and Wrigley does not appeal from that part of the lower court's decision. As such, they are not parties to this appeal
 
 
 [2]
 What the evidence does show is that Waters merely assured Wrigley and other customers that he would continue to have personal responsibility and control over the trademark renewal work following the sale of the prosecution end of the business in 1979. Thus, Wrigley understood that the renewal work was under Waters' ongoing personal control. Moreover, other business associates of Waters also considered Waters and his entities to be synonymous. We agree that the evidence supports these facts. However, Wrigley's argument that this permits the corporate veil to be pierced misses the mark. That Waters oversaw and controlled the renewal business does not mean that the corporate entities were mere alter egos. It merely demonstrates that Waters was personally involved in every aspect of the firms' work, not that the corporations were conducting his personal business
 
 
 [3]
 By way of comparison, it should be noted that Wrigley also took over some 1,500 trademark renewals that had been entrusted to the Chicago law firm of Hume, Clement. Hill testified that the transition with respect to that firm's trademark renewals went smoothly and no clean up costs were incurred by Wrigley:
 Q. [MR. HANDAL] Would you very briefly compare the condition, organization and accuracy of the files received from Hume Clement as compared to the files received from the defendant companies and individuals?
 A. [MS. HILL] The files that were received from the Hume Clement firm were completely in order. One could merely pick up the file, all of the documents were there or copies of the documents that were necessary to determine the status of the registration. These files from Hume Clement were in the same condition when they were received from Hume Clement as the files from Haseltine were after I finished putting them in order. I did not have to put the Hume Clement files in order.
 Q. Specifically--and I know you have testified to this a little bit earlier--but specifically, what problems forced you to put the Haseltine files into order?
 A. I couldn't tell what the status of the registrations were from the correspondence we had received from [defendants] up to that time.
 Q. Now, let's talk about those Hume Clement files. After you did some processing of them, I assume, and getting them into your system, is that correct?
 A. Yes.
 Q. In the course of that processing, did you send a letter to the associates to be certain of anything or to notify them or whatever?
 A. The transition of the Hume files was very easy, we merely noted the name of the associate from the file and sent out a repetitive letter. Hume Clement finished up all of their pending matters. We have no reason to take them away from them because we had every confidence that they would complete each matter. We had no experience where they told us that they did something, and they had not in fact done it. So the transition was very easy. It was merely a repetitive letter that would be redone and sent to the next associate.
 On cross-examination Hill testified as follows:
 Q. As a matter of fact, each of the steps that you did with respect to the [defendants'] files you a year later did with respect to the Hume Clement files, is that right?
 MR. HANDAL: Objection.
 A. [MS. HILL] That is not correct.
 MR. HANDAL: Mischaracterizing the testimony.
 MR. LEONARD: This is cross-examination.
 A. It is not correct.
 Q. Can you tell me in what respect what you did for the Hume Clement files differed from what you did for the [defendants'] files?
 A. Yes. On the surface the Hume Clement files were in order, the dates had been accurately calculated and there was no need to really delve into each piece of correspondence in the file. From a cursory review of the file each case was in order. That was not true with the [defendants'] files. And each case file was there.
 Q. When you say you did not delve into the Hume, Clement files, what did you delve into the [defendants'] files, if you did, for?
 A. I believe we have covered all this earlier.
 Q. Tell me again.
 A. In cases where we had been advised that renewal applications had been filed and they had not, there were no filing receipts, there were no confirmations that renewal applications had been filed. This just destroyed the whole credibility of what was being turned over to us and what they had represented they had done for us, and what the status of our marks was.
 Tr. 742-43.
 
 
 [4]
 The clean up costs were broken down as follows:
 We note here a small arithmetical discrepancy between this total and the $66,150.14 actually awarded by the district court. It is apparently traceable to a chart included in Wrigley's Proposed Findings of Fact and Conclusions of Law, filed with the district court on March 17, 1987. See 5 U.S.P.Q.2d at 1743 n. 3.