**DIRECTORS GUILD OF AMERICA, INC., Petitioner,**

v.

**GARRISON PRODUCTIONS, INC., Morton L. Ginsberg, and MLG Properties, Inc., Respondents.**

**No. 88 Civ. 0784 (RPP).**

United States District Court, S.D. New York.

March 30, 1990.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City, Julian R. Birnbaum, for petitioner.

Hahn & Hessen, New York City, Steven J. Mandelsberg, for respondents Morton L. Ginsberg and MLG Properties, Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION

ROBERT P. PATTERSON, Jr., District Judge.

This proceeding is brought pursuant to Section 9 of the United States Arbitration Act of 1925 as amended (the "Arbitration Act"), 9 U.S.C. § 9, and Section 301(a) of the Labor Management Relations Act of 1947, as amended ("LMRA"), 29 U.S.C. 185(a), by petitioner Directors Guild of America, Inc. ("DGA"), a labor organization, to confirm a labor arbitrator's award enforcing the provisions of a collective bargaining agreement against respondent Garrison Productions, Inc. ("Productions"), a motion picture production company. Productions failed to defend this action and on January 12, 1990, the Court signed a default judgment submitted by the petitioner against Productions. The remainder of this case, then, involves DGA's attempt to pierce the corporate veil of Productions to recover from respondents Morton L. Ginsberg ("Ginsberg") and MLG Properties Inc. ("MLG").

Jurisdiction lies pursuant to Section 301(a) of the LMRA, 29 U.S.C. § 185(a) and 28 U.S.C. § 1331. Venue is proper in this district pursuant to Section 9 of the Arbitration Act, 9 U.S.C. § 9 and Section 301(a) of the LMRA, 29 U.S.C. § 185(a).

The action was tried before this Court without a jury from July 5, 1989 through July 7, 1989. Proposed findings of fact and conclusions of law were submitted by the parties on January 2, 1990. This opinion constitutes the Court's findings of fact and conclusions of law.

## I. FACTS

DGA is an incorporated labor organization within the meaning of Section 301(a) of the LMRA. Its members are motion picture and television directors and related personnel. DGA maintains an office at 110 West 57th Street, New York City.

Productions is a New Jersey corporation which, at times relevant hereto, maintained its business in Guttenberg, New Jersey. It was incorporated in early September 1985 by Sandye Garrison and her attorney, Charles Chehebar. Its business purpose was to acquire and produce motion pictures. On September 19, 1985, shortly after the formation of Productions, a shareholders' agreement was entered into by the founding shareholders. That agreement reflects that the principal investor, Ginsberg, acquired 50% of the stock in return for providing $140,000 of Productions' initial capitalization of $141,000. Garrison invested $500 and Louis R. and Eileen M. Capone invested $500.[1] The shareholders' agreement provides that $50,000 of Ginsberg's contribution was to be held in escrow pending acquisition of the rights to produce a movie entitled "Single Room".

The Shareholders' Agreement sets forth a division of functions as follows:

*Functions.* Morton L. Ginsberg will be the principal investor in the Company and will advise it in all financial matters. Sandye Garrison will administer and execute all production projects undertaken by the Company, which functions will involve the preparation of a budget for each production, the negotiation of co-production agreements, casting the production and negotiation of all contracts pertaining thereto. Louis R. Capone will direct the sale and marketing of all projects and arrange for the music for all productions and will also negotiate and acquire rights to original musical scores and other related properties. Eileen M. Capone will be principally in charge of developing and obtaining properties for feature films.

Ginsberg, an attorney, is the sole owner of respondent MLG, Inc., a New York corporation used by Ginsberg to transact real estate business. Before he became involved in Productions, Ginsberg had no experience or skill in film production. Ginsberg was approached by Garrison, who needed financing in the form of "seed capital" from investors to acquire the rights to and thereafter to produce "Single Room." Garrison represented to Ginsberg that "Single Room" would attract a cast of well known movie stars and that the cast would in turn attract additional capital through a pre-sale of "Single Room" to a major studio.

In addition to interesting Ginsberg in "Single Room," Garrison also induced Ginsberg to advance additional moneys to Productions for the acquisition and production of a second film, "Hawken." From October 1985 to mid–1986, Ginsberg contributed approximately $1.8 million to Productions for the production and distribution of "Hawken." In the spring of 1986 final editing of "Hawken" had still not been completed. At that point Productions conveyed all its rights in "Hawken" to Ginsberg. No proof was adduced showing that there was consideration for this transfer.

In the meantime, Productions was attempting to gain the rights to, and thereafter produce, "Single Room," a German stage play by Johannes Reben. In March 1985 a German director, Wolfgang Panzer, who had been associated with European productions of "Single Room," obtained with Felix Bloch Erben the exclusive rights to an English language version of the play. In March of 1986, Garrison, on behalf of Productions, entered into a contract with

---

**1.** Garrison was elected president and chief executive officer of Productions, Louis R. Capone, its treasurer, and Eileen M. Capone, its secretary. A Board of Directors consisting of all four founding shareholders was elected and unanimous action was required of the Board.

Pantom Productions, S.A. ("Pantom"), a company controlled by Panzer, under which Panzer was to direct an English language production of "Single Room." The contract called for arbitration of all disputes under the rules and regulations of DGA. In June 1986 Productions entered into a contract with Pantom which provided that an assignment of all rights in "Single Room" would be received from Panzer and Erben upon receipt of payment in full of 250,000 Deutsche Marks. Pursuant to this contract, Productions paid $20,000 as an initial payment and agreed to pay Panzer for Erben a final payment of about $120,000 ten days before it started shooting "Single Room."

At about the same time, in June of 1986, the Capones resigned from and relinquished their 25% stock interest in Productions. In connection with this agreement, the Capones received a promise to pay $25,000 secured by a confession of judgment in that amount from Productions, from Garrison individually, from MLG and from Ginsberg personally.[2] After this buy-out of the Capones, Ginsberg was the holder of 75 percent of Productions' stock.[3]

Productions, as producer of "Single Room", signed the DGA Basic Agreement on July 26, 1986 (Pt. Ex. 9). The Basic Agreement obligated Productions to pay the salaries of DGA members and to make contributions to certain DGA pension and health and welfare plans.[4]

On September 2, 1986, after an arbitration hearing requested by DGA, the arbitrator, Walter Gellhorn, Esq., ordered Productions to post an escrow deposit of $50,000 pursuant to the DGA Basic Agreement to secure the salaries and health and welfare benefits of DGA members employed by Productions to produce "Single Room."

The $50,000 received by DGA for security was paid directly by MLG. MLG posted this deposit (on behalf of Productions) on September 4, 1986. Thereafter, in September 1986, Productions began active film production of "Single Room" with funds advanced by MLG. In September 1986 Panzer started filming "Single Room." After approximately one week Garrison and William C. Gerrity, Unit Production Manager, decided a new cinematographer should be hired. Ginsberg was so advised and approved the additional budgetary expenditure.

On September 24, 1986, after approximately one-third of the scenes had been filmed, Panzer refused to proceed further with the filming of "Single Room." Respondents claim that a number of disputes had arisen with Panzer. No testimony was offered to support this general charge. Accordingly, the Court finds the principal reasons for his refusal were (1) that Productions' post-dated September 17, 1986 check to Pantom Productions in the sum of $124,100 in final payment for the rights to "Single Room" (received on September 11, 1986, some days after it was due) had failed to clear due to insufficient funds, and (2) that Productions had failed to pay two installments of Panzer's salary. After September 24, 1986, the film-making ceased entirely. Panzer's differences with Productions were never resolved, and, pursuant to the terms of the licensing agreement, the rights to "Single Room" reverted to Felix Bloch Erben.

Ginsberg, acting for MLG and not Productions, attempted to renegotiate rights to "Single Room" in correspondence with Felix Bloch Erben in November and December 1986 (Pt. Exs. 23, 24, 26, 27), but was unsuccessful.[5] In those letters Ginsberg,

---

**2.** Under the agreement, the payments were to be guaranteed by MLG and the checks endorsed by Ginsberg, Garrison and MLG. (Pt. Ex. 10).

**3.** It is unclear how Ginsberg obtained the Capone's 25% interest in Productions. In any event, the arbitrator below found that, at the time of the arbitration, Ginsberg owned 75% of Productions' stock. No evidence in conflict with that finding was adduced before this Court.

**4.** It is noted that the DGA Basic Agreement is binding on parties assigned a substantial part of the business of the employer. (Pt. Ex. 1 p. 165).

**5.** In this correspondence, Ginsberg wrote on MLG stationery as "President of MLG Properties, Inc., the principal investor, through Garrison Productions, Inc." In the arbitration proceeding below, the arbitrator determined that the letters were between Erben and MLG, not Productions. (Pt. Ex. 3 at 7 n. 1).

not Productions, sought to obtain the rights to film "Single Room." The letters are written on MLG stationery using the phrases, "We demand that you immediately withdraw Mr. Panzer's option ... arrange a payment schedule ... with the understanding we will 'Americanize the story'" and "We would thus acquire the same rights as ... Pantom ... We are of the opinion Wolfgang Panzer ... is not a proper director for this project and that the script must be revised by a writer of our choice, which is an absolute precondition of any new deal *we* make" (emphasis added).

Throughout the entire period prior to September 24, 1986, Ginsberg provided all the financing for the operations of Productions, other than the two $500 contributions to capital by Garrison and the Capones. After the exhaustion of Productions' initial capitalization, which had been provided almost entirely by Ginsberg, funds were advanced at such times as Garrison advised Joseph Kazarnovsky of MLG of the necessity of specific expenses incurred by Productions. Upon receipt of the funds, Productions would then make the payment of those expenses. Usually the MLG checks were signed by Kazarnovsky, an attorney in Ginsberg's office. On occasion, Productions' bills were paid directly by MLG or from the escrow account of Ginsberg's law firm after clearance with Ginsberg. Between October 1985 and October 1986 MLG had paid Productions over $1.8 million for expenses in connection with "Single Room." (Tr. 224, Pt. Ex. 29).[6]

Because of this unusual procedure, Ginsberg had final approval of virtually all corporate decisions, financial and artistic. His power over the corporation is exemplified by the fact that he delayed the financing of and the acquisition of the rights to "Single Room" until the "Hawken" shooting was complete and Garrison had signed Geraldine Page for the new picture, (Pt. Ex. 37 at 52) and by his action in having "Hawken" transferred to him without consideration before Productions started "Single Room."

On November 3, 1986, DGA filed a demand for arbitration on behalf of those of its members, Panzer, W.C. Gerrity, C.J. Gerrity, L. Jacobs and A. Merins, who were on the production crew of "Single Room," seeking from Productions unpaid salaries for services performed by those members, as well as related payments to the DGA–Producer Pension, Health and Welfare Trust Plans.[7] At the arbitration hearings in December 1986 and January and April 1987, Productions was represented by Garrison and Kazarnovsky. Kazarnovsky testified in the present action that he relied totally on Garrison in defending the arbitration as she was the only person with knowledge of the facts. Ginsberg and MLG were not parties to the arbitration proceeding. The arbitrator issued a written award dated August 31, 1987, awarding DGA full relief.

In January 1987 Ginsberg, acting as an attorney, instituted a suit against Panzer and Pantom Production on behalf of Productions. It was dismissed.

Thereafter, in May 1987, Garrison entered into an agreement with Ginsberg whereby she turned over her stock to Ginsberg, resigned as an officer of Productions, and quitclaimed to Ginsberg any residual

---

**6.** Prior to September 24, 1986 Ginsberg made or authorized direct payments to creditors of Productions as follows: (1) check drawn on Kazarnovsky's escrow account in the amount of $52,-200, payable to Sir John Gielgud, an actor in "Single Room"; (2) check of MLG for $50,000 dated 7/25/86 payable to Kazarnovsky to reimburse him for Productions' expenses; (3) check of MLG for $14,000 dated 8/12/86 to New Jersey State Treasurer for license for shooting film at Ridgewood Park; (4) check of MLG for $42,-000 dated 8/15/86 payable to Productions for payroll; (5) check of MLG for $50,000 dated 9/5/86 payable to DGA for $50,000 for performance bond pursuant to arbitration; (6) check of

MLG for $125,000 dated 9/5/86 payable to Don Ameche, an actor in "Single Room". After filmmaking ceased and while other creditors were not paid, MLG paid Film World Security $8,658 and Sandye Garrison $15,855 on 10/10/86 and $15,000 on 10/17/86. In addition, during depositions it was admitted by MLG that other payments to creditors of Productions were made after September 24, 1986 and that payments were made to get the "Single Room" film prints.

**7.** Both the DGA Basic Agreement and Productions' agreement with Panzer provided for disputes to be resolved by arbitration.

rights she may have had in "Hawken" (Pl. Exh. 32).[8] Under the agreement, Productions' creditors were notified of Garrison's resignation and were instructed to contact MLG to arrange for payment. Also, under the agreement Ginsberg agreed (1) to use his best efforts to complete post production work on "Hawken" in order to distribute the work, and (2) to indemnify Garrison against personal liabilities to Productions' listed creditors. The agreement called for Garrison to be paid the amount of her producer's fee from profits from "Hawken" if profits occurred.

The only remaining asset of Productions after the May 1987 agreement between Garrison and Ginsberg were the partially completed prints of "Single Room" and related materials. Thereafter, Ginsberg obtained personal custody of the "Single Room" prints and related materials by paying the film laboratory, through MLG. Thus, after the May 1987 agreement with Garrison, Ginsberg was the sole owner of Productions and had custody of its only asset.

Ginsberg, through MLG, paid about $50,000 to five creditors of Productions whom he alleges could have made personal claims against Garrison. Ginsberg intended that these payments would thereby relieve Productions of liabilities incurred through Garrison. Before or shortly after production on "Single Room" had stopped, certain other creditors of Productions also received payment from MLG or Ginsberg. Thereafter, Ginsberg himself decided which of Productions' obligations he would honor and which he would not. Among those that were not honored was the arbitrator's award to DGA at issue in this case.

After Productions failed to pay the arbitration award, DGA commenced this proceeding in February 1988 by filing a petition against Productions, Ginsberg and MLG for the amount of the arbitration award and for attorneys' fees and costs. Productions did not answer the petition. Ginsberg and MLG deny any and all liability.

## II. DISCUSSION

■ Petitioner argues that Ginsberg, both personally and through MLG, exerted *de facto* control of Productions on all decisions ranging from the financial to the artistic and creative, and that liability therefore should be imposed beyond Productions' corporate identity on Ginsberg personally and MLG as the parent corporation. Plaintiffs argue that the facts satisfy the standard under New York law for piercing the corporate veil. Alternatively, petitioners argue that the corporate veil should be pierced for equitable reasons.

Under New York law there is a strong presumption in favor of corporate separateness. *See William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir.1989) ("It is well settled that New York courts are reluctant to disregard the corporate entity"; citing cases); *Port Chester Elec. Const. Co. v. Atlas*, 40 N.Y.2d 652, 389 N.Y.S.2d 327, 331, 357 N.E.2d 983, 987 (1976) ("Ordinarily [corporations'] separate personalities cannot be disregarded.").

Under the New York standard for piercing the corporate veil, as initially set forth in *Lowendahl v. Baltimore & O.R. Co.*, 247 A.D. 144, 287 N.Y.S. 62, 76, *aff'd*, 272 N.Y. 360, 6 N.E.2d 56 (1936), a shareholder may be liable for the acts of a corporation if there exists:

1. Control, not mere majority or complete stock control, but complete domination, not only of the finances but of policy and business practice *in respect to the transaction attacked* [emphasis added] so that the corporate entity as to this transaction had *at the time* [emphasis in original] no separate mind, will or existence of its own; and

2. Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

3. The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

---

**8.** "Hawken" has since been released as "Morton Ginsberg presents Hawken's Breed."

*Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir.1985) (quoting *Lowendahl*) (emphasis in *Lowendahl*). *See also Fisser v. International Bank*, 282 F.2d 231 (2d Cir.1960) (adopting the *Lowendahl* standard).

The Second Circuit recently reiterated the applicable test to pierce the corporate veil. In *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir.1989), the court described New York law as follows:

> [T]he corporate veil will be pierced only when it can be demonstrated that the '[corporate] form has been used to achieve fraud, or when the corporation has been so dominated by an individual ... and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.' (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir.1979)).

*See also A/S Domino Mobler v. Braverman*, 669 F.Supp. 592, 594 (S.D.N.Y.1987) ("The essential inquiry on a claim to pierce the corporate veil is whether the corporate form has been abused; i.e., whether the shareholder used his control of the corporation to further his own, rather than the corporation's, business or whether the shareholder used the corporate vehicle to achieve a fraud.").

In making this determination, courts consider several factors, including the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to maintain separate books and records or other formal legal requirements for the corporation, and siphoning of corporate funds by the dominant shareholder. *William Wrigley*, 890 F.2d at 600–01. Finally, the court is to be guided by the general principle that "liability is imposed when doing so would achieve an equitable result." *Id.*, 890 F.2d at 601, quoting *A/S Domino Mobler v. Braverman*, 669 F.Supp. at 594, citing *Brunswick Corp. v. Waxman*, 599 F.2d 34, 35 (2d Cir.1979).

The Second Circuit in *William Wrigley* further reminded that, in cases involving small privately-held corporations, preoccupation with strict corporate formality as followed in "sophisticated corporate life" is inappropriate, finding that in general courts have not disregarded the corporate form absent "an abuse of that form either through on-going fraudulent activities of a principal, or a pronounced and intimate commingling of identities of the corporation and its principal or principals, which prompted the reviewing courts, driven by equity, to disregard the corporate form." *William Wrigley*, 890 F.2d at 601.

The evidence demonstrates, and the Court finds, that Ginsberg so dominated and controlled Productions and the "Single Room" project that the DGA members who are claimants here regarded him as in control of the financing of the "Single Room" production and performed their services for Productions in reliance on his continued activity; and that he used his control to unjustly deprive plaintiffs of the back salary and benefits which are the subject of the arbitration award.

First, the evidence demonstrates that Ginsberg was in control of the corporation. He was a 50% shareholder from the beginning, a 75% shareholder in June 1986, and by May, 1987, he was able, by utilizing his financial control over the corporation, to become its sole shareholder. From the beginning, he was the principal investor providing over 99% of the cash contributions for capital of the corporation. From the beginning, Ginsberg was also a director on a Board which required unanimous consent for any action taken. Thus, he had veto power. The shareholders' agreement of September 19, 1985 was drafted to permit him greater control of the corporation than any ordinary "angel" would have.

Furthermore, the unusual manner in which Ginsberg and MLG transmitted funds to Productions gave Ginsberg financial control over the corporation. Thus, although Garrison was president of Productions, signed all contracts, hired and fired all actors and employees, and made the necessary arrangements for the acquisition of the properties Productions sought to produce, all such arrangements were subject to the funds being advanced and authorized to be advanced by Ginsberg.

The funds were advanced on an as needed basis initially once or twice a month, increasing to twice a week and even daily in September 1986. Thus Ginsberg controlled the ability of Productions to meet its obligations and a strong inference is created that those obligations were undertaken by Productions with his explicit or implicit approval.[9] The separation agreement with the Capones in June 1986 implicitly acknowledges the parties' understanding that Ginsberg controlled the ability of Productions to meet its obligations.

While Ginsberg's domination of the corporation, as described above, may not have been "complete as to every detail," it is well established that the corporate veil may be pierced where the domination is " 'complete ... in respect to the transaction attacked.' " *Gorrill v. Icelandair/Fluglei-dir*, 761 F.2d at 853. It is clear that Ginsberg dominated and controlled the specific transaction at issue here—the payment of wages with respect to the production of "Single Room." Ginsberg's decision not to pay DGA's members for their work on "Single Room" and later not to pay the arbitration award, coupled with the manner in which Ginsberg controlled the company's finances and assets, effectively eliminated the possibility that DGA's members would get paid for their work. Ginsberg certainly was "the ultimate arbiter of the extent to which performance was to be discharged." *Data Probe, Inc. v. 575 Computer Services, Inc.*, 72 Misc.2d 602, 340 N.Y.S.2d 56, 61 (N.Y.City Civ.Ct.1972), cited in *David v. Glemby Co.*, 717 F.Supp. 162, 168 (S.D.N.Y.1989).

Furthermore, that Ginsberg regarded himself as in control of Productions and the "Single Room" project is exemplified by his subsequent efforts to renegotiate the rights to that project through correspondence with Felix Bloch Erben. That correspondence makes clear that Ginsberg did not regard Productions and MLG as two separate and distinct corporations, and that he considered "Single Room" to be as much a project of MLG as Productions.

Ginsberg's claim that he had only expected to provide seed money for "Single Room" and thereafter was forced to infuse the corporation with additional capital when Garrison argued that "otherwise what you have in will go down the drain," is not consistent with the other evidence. $50,000 of his contribution was to be held in escrow pending the acquisition of the rights to "Single Room," while in the meantime, Ginsberg spent significant sums on "Hawken" before the rights to "Single Room" were acquired. Not until March 1986, during the "Hawken" project, was Panzer hired to direct "Single Room" and it was June 1986 when the rights were finally acquired. Prior to that time no substantial investment by Ginsberg would have "gone down the drain" had he stopped supporting the "Single Room" production. After that time, having spent $1.5 million on filming "Hawken", Ginsberg knew what kind of investment would be required for "Single Room." Furthermore, the total costs for "Single Room" were all outlined in the budget, which was over $3 million. Ginsberg was also aware that a pre-sale of "Single Room" might not be arranged, since "Hawken" had not been able to be pre-sold during production. Thus, Ginsberg was clearly aware of the financial requirements for going forward with "Single Room."

Furthermore, Ginsberg and MLG operated Productions with little regard for corporate formalities. Ginsberg and MLG often by-passed Productions to pay creditors directly. Productions has no minutes or records of corporate meetings or records of directors authorizing significant events, such as transfers of assets to Ginsberg and the buy-out of Garrison, which were completed with virtually no evidence of corporate meetings or formal actions. While the Second Circuit has cautioned against "preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history" in small privately-held corporations, *William Wrigley*, 890 F.2d at 601, in this case very basic concepts of corporate formality, such as payment by

---

**9.** The record does not contain any testimony    from Garrison to the contrary.

the corporation rather than shareholders to creditors, were largely ignored.

Here, Ginsberg manipulated the corporate form in such a way that he controlled every asset, made all major decisions with respect to the funding of the corporation, and treated the corporation as his own instrumentality, while at the same time hiding behind the corporate form when creditors, especially DGA, demanded their rightful payments pursuant to contract. This course of conduct amounts to an unjust act such that disregarding the corporate form is warranted. *Gorrill v. Icelandair/Flugleidir*, 761 F.2d at 853; *David v. Glemby Co.*, 717 F.Supp. at 166, citing *Data Probe, Inc. v. 575 Computer Services, Inc.*, *supra*.

■ Petitioner also established that, by having Productions transfer "Hawken" to him, with little or no consideration, apparently for tax reasons, and by obtaining personal custody and control over the "Single Room" materials, Ginsberg used his domination of Productions for his personal interests. Also, the clear inference is that Ginsberg and MLG deliberately undercapitalized Productions. Carrying on a business without substantial capital and leaving the corporation without substantial assets to meet its debts can justify piercing the corporate veil. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685–86 (4th Cir.1976); *see also Coleman v. Corning Glass Works*, 619 F.Supp. 950, 956 (W.D.N.Y.1985), *aff'd*, 818 F.2d 874 (Fed.Cir.1987). Ginsberg operated Productions in such a way that the corporation was constantly without cash and was required to seek funding from him for all major disbursements. Thus, when Ginsberg decided not to pay a creditor, the corporation itself was unable to make the payment.

Under such circumstances the equities favor an employee who has performed services over the person who has undertaken steady financial support of the film-making venture, whether formally in the shareholders' agreement or by the course of action he has consistently pursued over a lengthy period of time. Thus, piercing the corporate veil in this case, and thereby allowing petitioner to recover from Ginsberg and MLG, would achieve an equitable result. *See Brunswick Corp. v. Waxman*, 599 F.2d at 36.

Viewing the evidence as a whole, the Court finds that Ginsberg as sole investor and as the sole director in control of the corporation's finances was in a control position as to Productions; that he failed to observe corporate formalities adequately between MLG and Productions; that he used his control over the company to further his personal interests; that he operated the company in such a way that it was often undercapitalized; that this manner of operating the company amounted to an unjust act with respect to DGA's members; and that Ginsberg's conduct is not consonant with fair dealing with employees. Accordingly, the Court holds that it is appropriate to pierce the corporate veil of Productions to hold Ginsberg and MLG jointly and severally liable to petitioner with respect to the arbitration award.

■ As an alternative holding, the Court finds that Ginsberg is liable pursuant to § 17–203 of the DGA Basic Agreement, which states that the agreement is binding upon those who are assigned or purchase "a substantial part of the business of the employer." On this basis, the assignment to Ginsberg of "Hawken," which was one of the only assets of Productions, renders him liable under the DGA Basic Agreement to pay the arbitration award to plaintiff.

### III. CONCLUSION

The Court therefore orders that judgment be entered for plaintiff. Plaintiff shall submit a proposed judgment on 5 days notice to defendants within ten days of the date of entry of this decision.

SO ORDERED.