Samuel **BARNINGER** et al., Plaintiffs,

v.

**NATIONAL MARITIME UNION** et al., Defendants.

No. 72 Civ. 1949.

United States District Court,
S. D. New York.

March 5, 1974.

Rabinowitz, Boudin & Standard, New York City, for plaintiffs; K. Randlett Walster and Dorian Bowman, New York City, of counsel.

Abraham E. Freedman, New York City, for defendant National Maritime Union; Charles Sovel, New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendant Bd. of Trustees, National Maritime Union Pension Plan; Michael A. Cardozo and Myra J. Green, New York City, of counsel.

GURFEIN, District Judge:

Nine named plaintiffs have brought this purported class action against the defendants National Maritime Union ("NMU") and the Trustees of the NMU Pension Plan ("Pension Plan" or "Trustees"), and an employers association, American Merchant Marine Institute, Inc. ("Institute") which had had a collective bargaining agreement with NMU and is now defunct.

NMU is a labor organization representing, for purposes of collective bargaining, unlicensed seamen of various employers in the American Merchant Marine. Defendant Pension Plan (Trustees) is a pension plan established pursuant to the provisions of Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, to provide pensions to employees of contributing employers. Half of the trustees are appointed by the Union and the other half by the employ-ers contributing to the Pension Plan, i. e., by those having a collective bargaining agreement with defendant Union. The Pension Plan is funded solely by employer contributions.

Plaintiffs are unlicensed seamen who are members of the National Maritime Union.

THE COMPLAINT

The action was commenced by the filing of a summons and complaint dated April 11, 1972. The amended complaint of the plaintiffs was filed on July 3, 1972 (hereinafter "complaint"). Defendants NMU and the Trustees have moved for summary judgment.

The complaint alleges, in substance, that the plaintiffs and the class they represent are entitled to pensions under the NMU Pension Plan and that they are entitled to enforcement of their rights accordingly. The plaintiff seamen are by now old men. To understand their grievances, one must delve into a bygone era in American history.

The NMU was founded in 1937, and a number of the plaintiffs were among its founders. For many years prior to 1950, the plaintiffs sailed the seas as unlicensed seamen and as members of the NMU. Between 1951 and 1955, the complaint alleges, the plaintiffs had been prevented from sailing because the United States Coast Guard refused to issue them security clearances. In 1955, the Court of Appeals for the Ninth Circuit held, in Parker v. Lester, 227 F.2d 708 (9 Cir. 1955), that the procedure followed by the Coast Guard violated the essentials of due process and was unconstitutional. Thereafter, at various times between January 1 and June 1, 1957, the Coast Guard restored valid Merchant Mariner's documents to the plaintiffs and other unlicensed seamen who had previously been denied security clearance.

It is alleged that there was no substantial opportunity to secure employment as an unlicensed seaman in the Port of New York except through referral by the NMU; and that the NMU deliber-

ately provided in its scheme of priorities for referral that in order to be classified in Group 1, the most favored group, unlicensed seamen must have been employed during the period of June 1, 1953 and December 31, 1953, inclusive.[1] It is alleged that the NMU did this in violation of its duty as bargaining representative, and for the purpose of giving effect to the Coast Guard's decision to screen plaintiffs and their class off the ships for loyalty reasons. It is specifically charged that "[t]he adoption of this period to determine eligibility in Group 1 by the NMU and the Institute constituted a continuation of the Coast Guard's unconstitutional screening action." (Compl. ¶ 19).

Moreover, it is alleged that in June, 1957, the NMU, in violation of its duty as collective bargaining agent, amended its collective bargaining agreements with the Institute to authorize the NMU to refuse to refer for employment the plaintiffs and others similarly situated.

This alleged discriminatory course of conduct has resulted in two actions. In 1958, an action entitled Berman et al. v. NMU et al. #130–187 was started in this court to enjoin the NMU from refusing to register and assign the plaintiffs for work in a Group 1 priority. Judge Bicks refused to dismiss the complaint, 166 F.Supp. 327 (S.D.N.Y.1958), and the action was subsequently settled, of which more herein.

The second action arising out of the NMU's alleged discriminatory activity is this action. It is alleged that but for the arbitrary refusal to refer them for work, the plaintiffs would have been able to sail after June 16, 1957, the date of the alleged discriminatory amendment to the collective bargaining agreement, and that they should not have been penalized for having been prevented, as well, from sailing in the crucial 1951–1953 period.

The complaint further alleges that the regulation of the Pension Plan, first adopted in 1953, and carried over in essentially the same form to today, where-

by a break-in-service results if a man fails to work 200 days in every three year period, "was adopted . . . for the purpose of excluding screened seamen from pension benefits." (Compl. ¶ 31). The related regulation, that to obtain pension credit for the period prior to 1951 a seaman had to have worked at least 200 days between 1951 and 1953, was also adopted, plaintiffs allege, "for the purpose of excluding seamen screened by the Coast Guard." (Compl. ¶ 29). Adoption of the challenged regulations by the Trustees as "agent" for the NMU and the Institute, the complaint concludes, constituted a violation of the NMU's duty of fair representation. (Compl. ¶ 33).

The relief requested on behalf of the named plaintiffs and others alleged to be similarly situated includes: (a) a declaratory judgment that the time between 1951 and 1960 that the plaintiffs were prevented from sailing by the United States Coast Guard or the NMU be declared not to be a break-in-service under the Pension Plan,

(b) that the NMU be required to contribute an appropriate dollar amount to the pension trust,

(c) that a full year's pension credit be given for each year any plaintiff was prevented from sailing by the NMU or the United States Coast Guard,

(d) that the Trustees be enjoined from refusing to pay plaintiffs a pension,

(e) that the plaintiffs, as a class, be awarded damages, and

(f) attorneys' fees.

Federal subject matter jurisdiction is based on 28 U.S.C. § 1337, the commerce jurisdiction, with pendent jurisdiction alleged over state claims. The action arises under the Labor Management Relations Act, 29 U.S.C. § 141 et seq. The defendant assumes that it arises under 29 U.S.C. § 185 (Section 301 of the Act), but that section deals with suits "for violation of contracts."

---

1. There were some other alternative categories but none was applicable to these plaintiffs.

The plaintiffs are right when they say that their claim is based rather on 29 U.S.C. § 159 (Section 101 of the Act) which provides that representatives designated for collective bargaining shall be "the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, *or other conditions of employment.*" (Emphasis supplied). The NMU was the exclusive representative for bargaining the terms of the Pension Plan—a "condition of employment." As such representative, it owed the plaintiff members of the union a duty of fair and non-discriminatory representation. Ford Motor Co. v. Huffman, 345 U.S. 330, 337, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Steele v. Louisville & N. R. Co., 323 U.S. 192, 198–199, 65 S.Ct. 226, 89 L.Ed. 173 (1944). Allegations such as these support jurisdiction under a claim of violation of Section 101.

### Class Action

■ The first issue for resolution is whether the named plaintiffs have established their right to represent a class. I am constrained to find that they have not. A good deal of discovery has been allowed to go forward on this issue, but there has been inadequate proof of a class sufficiently numerous to warrant class action treatment.

There are, as we have seen, nine named plaintiffs. The other potential class members would have to be persons similarly discriminated against. Such persons would be unlicensed seamen who (1) had been employed as provided for in the Plan before the United States Coast Guard screening; (2) were denied security clearance by the Coast Guard; (3) did not sail 200 days during the period 1951–1953; (4) went back to work on the ships after the freeze was lifted and (5) are otherwise eligible by age and years of service to a pension, but whose pension eligibility is now restricted because they were precluded from employment by the NMU and the Coast Guard.

Neither the previous efforts of the plaintiffs to locate such persons by extensive correspondence nor by other means has been of any avail. The plaintiffs have suggested that, aside from three intervenors, there may be fifty other members of the class. They have actually tendered twenty-six names of persons who might become class members.

Of these, the process of discovery has elicited that nine either never returned to sea service in the 1960's,[2] or were not members of the NMU,[3] or have already sued for a pension unsuccessfully.[4] With respect to five others there has been insufficient proof that they belong in the class.[5] In addition, there are six other possible class members who have failed to reply to requests for information.

The upshot is that there are only six additional persons who may be considered eligible for the class at this time, making a total of fifteen or eighteen in all. Since this is the conclusion at the end of years of search, I cannot find that "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a).

I believe that, aside from the question of numerousness, the class action does meet the prerequisites under Rule 23(a) (3) and (4), and is maintainable under 23(b)(2), since "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Since there is a claim for money damages, a class determination would require notice to the class. Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1015 (2 Cir. 1973), cert. granted, 414

---

2. Jacob Green; Thomas Ray; Al Scander; James W. Drake; Don Perella.

3. James Wright; Morris Pinsky; Ed Homer.

4. Robert Walker.

5. Gugliano; Nick Arrindale; Elmer Reese; James Edwards; Ed Emery.

U.S. 908, 94 S.Ct. 235, 38 L.Ed.2d 146 (1973), and the requirement of the best notice practicable under the circumstances would have to be fashioned for men who sail the seven seas or have possibly retired to some exotic port of call. The action is not properly manageable as a class action because of the notice requirement. But this should not be cause for distress.

■ Intervention will, of course, be freely allowed, since seamen are wards of the Court. Consolidation is as effective in these circumstances as the class action device. There are situations in which Rule 23 is simply not the best of all modes of procedure. Here, for example, there may be affirmative defenses which turn on a special privity of the particular person. It is easier, though I agree that this may not always be conclusive, to handle issues of limitations or release by treating each plaintiff as an individual party.

I shall, accordingly, order the class action allegations stricken from the complaint.

### THE MOTION FOR SUMMARY JUDGMENT

#### *Statute of Limitations*

■■ In the case of federal rights created by statutes (here by implication from statute), Ford Motor Co. v. Huffman, *supra*, the district court looks to the law of the state where it sits to determine the appropriate limitation period when no such limitation has been provided by Congress. International Union, United Automobile, Aerospace, Agricultural Implement Workers of America (U.A.W.) AFL-CIO v. Hoosier Cardinal Corp., 383 U.S. 696, 703–705, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); Abrams v. Carrier Corporation, 434 F.2d 1234, 1251 (2 Cir. 1970).

■ Section 213(1) of the New York Civil Practice Law and Rules, McKinney's Consol.Laws, c. 8, prescribes a six-year statute of limitations for actions "for which no limitation is specifically prescribed by law." The question then

becomes when the claim began to accrue. Leaving aside the pendent claims, the gravamen of the action is the charge of unfair representation evidenced by an amendment of the pension plan allegedly to discriminate against the plaintiffs. That conduct occurred more than six years before the commencement of this action in 1972. But the issue of when the statute began to run may turn not on the time when the defendant set in motion the chain of events that led to ultimate injury, but rather when the plaintiff first had a claim for relief. A general harm sometimes does not give rise to an action for relief. The test is when the particular plaintiff became entitled to vindicate his individual rights. See, e. g., Zenith Radio Corp. v. Hazeltine Research, Inc, 401 U.S. 321, 339–340, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

■ In the case of a pension plan, the beneficiary generally has no right of action until his rights have vested by the confluence of the stipulated time with his continued adherence to the conditions of the plan. The pension claim on its vesting would become a claim only for money damages. A failure to assert it before it becomes vested does not start the statute running. Such claims for money only may not be the subject of actions for anticipatory breach. Bird v. Computer Technology, Inc., 364 F.Supp. 1336, 1345 (S.D.N.Y.1973); Schwartz v. Victory Container Corp., 294 F.Supp. 866, 868 (S.D.N.Y.1969); Medaris v. Lionel Corp., 25 A.D.2d 735, 268 N.Y.S. 2d 936 (1st Dept.1966).

■ Nor is the failure to utilize the modern procedure of declaratory judgment enough to start the statute running. Sorrentino v. Mierzwa, 25 N.Y. 2d 59, 62–63, 302 N.Y.2d 565, 250 N.E. 2d 58 (1969). The declaratory judgment remedy is an optional device.

The liability of the defendant union is not governed by the contract statute of limitations as it was in Abrams v. Carrier Corporation, *supra*, a Section 301 action, based on collusion with the employer in a breach of contract. In the

case at bar, the violation charged is of Section 101, and the union can be held accountable for its failure fairly to represent all in the bargaining unit, the kind of breach of duty which admits of proof that the misconduct continued after the first overt breach of duty. But cf. Falsetti v. Local Union No. 2026, United Mine Workers, 355 F.2d 658, 662 (3 Cir. 1966) (a breach of contract situation.) It may be that if the NMU could get a bad amendment to the Pension Plan once, it could have got a good amendment later. That remains to be seen.

It seems to me that the whole course of events down to the time when each plaintiff first got an accrued claim for relief is relevant. This is not a case where the effect of the statute of limitations can be determined in advance of trial.

Since the Trustees are a necessary party, as Judge Brieant has held in this case, see also Nedd v. United Mine Workers of America, 400 F.2d 103, 107 (3 Cir. 1968), it is unproductive to explore at this time the rather difficult questions of what is a repudiation sufficiently precise to start the limitation period, and when such a repudiation of an express trust takes effect. A pension plan looks like a hybrid trust. See Roark v. Lewis, 130 U.S.App.D.C. 360, 401 F.2d 425, 427 (1968). The parties will be free to raise such issues on the trial.[6]

Lastly, one may not assume that a claim for relief yet unmatured was the subject of the prior action. Even where the tortious conduct has already occurred, all its proximate results may not yet have been measurable. Cf. Zenith Radio Corp. v. Hazeltine Research, Inc., *supra,* 401 U.S. at 338–342, 91 S.Ct. 795; Ansul Company v. Uniroyal, Inc., 448 F.2d 872, 884–885 (2 Cir. 1971); Railing v. United Mine Workers of America, 445 F.2d 353, 354–355 (4 Cir. 1971)

(after remand, 401 U.S. 486, 91 S.Ct. 991, 28 L.Ed.2d 272 (1971)).

### Release

There is no doubt that the five plaintiffs who were also in the *Berman* suit agreed to sign general releases. It is of no moment that the releases can no longer be found. Each signed the settlement agreement which required each to furnish such a release. Equity must regard as done what should have been done. The question of the scope and effect of the releases remains however. They were general in form and purported to extinguish all claims "from the beginning of the world." Def. Ex. B–10. The defendant says they are binding on the five plaintiffs. The plaintiffs say they are not.

■ Since the rights claimed arise out of a federal statute, federal law determines the validity of a release arising from such claim. Maynard v. Durham & Southern Ry. Co., 365 U.S. 160, 81 S.Ct. 561, 5 L.Ed.2d 486 (1961); Dice v. Akron, C. & Y. R. Co., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952); Zenith Radio Corp. v. Hazeltine Research, Inc., *supra.*

■ The effect of general releases is one of the most troublesome questions in modern law. Compare, for example, the analysis of Judge Frank, writing for the majority, with the dissenting opinion of Judge Learned Hand in Kelcey v. Tankers Company, 217 F.2d 541, 545–556 (2 Cir. 1954). When a release purports to waive a federally created private right, it may also be subjected to special scrutiny on policy grounds. See Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 704–705, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), and cases cited therein.

In other respects, federal law does not seem different from general law. The Second Circuit, in a diversity action, has said: "The scope and meaning of a re-

---

6. I have not treated laches as a separate defense, because I believe the statute of limitations is applicable; and because the con-

flict of facts would require an evidentiary hearing, which can be more easily handled as part of the trial.

lease will be determined by the manifested intent of the parties—in Corbin's words, 'by the process of interpretation, just as in the case of determining the meaning of an executory contract.' 5A Corbin Contracts § 1238 at 560 (1964)." Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 263 (2 Cir. 1965). Yet, in the interpretation of a general release courts do go further in admitting parol evidence than when they are determining the meaning of an executory contract. See, e. g., Rotberg v. Dodwell & Co., 152 F.2d 100, 101 (2 Cir. 1945); Schine v. Schine, 250 F.Supp. 822, 826 (S.D.N.Y.1966).

The New York Court of Appeals has held that ". . . a release may not be read to cover matters which the parties did not desire or intend to dispose of." Cahill v. Regan, 5 N.Y.2d 292, 299, 184 N.Y.S.2d 348, 354, 157 N.E.2d 505 (1959); see Mangini v. McClurg, 24 N.Y.2d 556, 563, 301 N.Y.S.2d 508, 249 N.E.2d 386 (1969).

Since intent is at issue and since public policy must be reckoned with, the defense of release hardly justifies summary judgment. The ultimate determination should await a trial in which the meaning of the releases will be in issue. Cf. Maynard v. Durham & Southern Ry. Co., supra. See Gordon v. Vincent Youmans, Inc., supra.

### Res Judicata

I have considered carefully the defense of res judicata as a ground for summary judgment. I must conclude that the issue should await a trial. Not all the plaintiffs were in the Berman suit or its settlement.

Since there was no trial but a settlement approved by Judge Bicks without findings, the issue is not as susceptible of summary disposition as it might have been after a full trial with findings. Cf. Desrosiers v. American Cyanamid Co., 377 F.2d 864, 872 (2 Cir. 1967).

There are factual questions with respect to the scope of the settlement, particularly on whether and how the issue of pension rights was raised and settled.

See McNellis v. First Federal Sav. & L. Ass'n, 364 F.2d 251, 257 (2 Cir. 1966). These may include the question of whether the present claim was unmatured at the time of settlement and whether there was intention to include it nevertheless, even though the proximate results of certain tortious conduct might not have been measurable at the time. Cf. Zenith Radio Corp. v. Hazeltine Research, Inc., supra.

The motion to denominate this a class action is denied.

The motions for summary judgment by each defendant are denied.

The three intervenors are directed to file a complaint.

The parties are directed to confer promptly on a pre-trial order.