**LOCAL 144, HOTEL, HOSPITAL, NURSING HOME AND ALLIED SERVICES UNION, SEIU, AFL–CIO, Plaintiff,**

v.

**C.N.H. MANAGEMENT ASSOCIATES, INC., Marvin Neiman, individually and as sole proprietor of Concourse Nursing Home, Defendants.**

No. 87 Civ. 2778 (RWS)

United States District Court,
S.D. New York.

Dec. 11, 1990.

Vladeck, Waldman, Elias & Engelhard, P.C. (Daniel Engelstein, Barbara J. Olshansky, of counsel), New York City, for plaintiff.

Marvin Neiman, P.C. (Theodore T. Mairanz, of counsel), New York City, Levine, Weinberg, Kaley & Pergament, P.C., Garden City, N.Y., Gold & Wachtel, New York City, of counsel), for defendant Neiman.

## OPINION

SWEET, District Judge.

### THE PARTIES

Plaintiff Local 144, Hotel, Hospital, Nursing Home and Allied Services Union, SEIU, AFL–CIO ("Local 144" or the "Union") has since 1977 represented licensed practical nurses, nurses' aids, orderlies, laundry workers, and kitchen staff at the Concourse Nursing Home ("Concourse"), a facility in the Bronx licensed by New York State (the "State").

Defendant CNH is a management company providing labor services to Concourse. Defendant Marvin Neiman ("Neiman") has been the proprietor of Concourse since 1974.

### PRIOR PROCEEDINGS

On March 19, 1987, Arbitrator John Sands (the "Arbitrator") issued an Interim Opinion and Award (the "Interim Award") finding that Neiman, as nursing home operator, had received more than six million dollars from the State to be directed towards bringing employee wages up to industry-wide levels. The Arbitrator found that failure to disburse the monies to the employees was an intentional and egregious breach of contract. In accordance with this determination, Sands directed CNH to pay "the minimum amount due—

$6,271,240—plus interest" into an escrow account. CNH and Neiman failed to comply with the award.

On April 24, 1987, Local 144 filed its complaint alleging four causes of action. The first and second causes of action sought enforcement of the Interim Award against CNH and Neiman, respectively. The third cause of action stated a claim of equitable subrogation against defendant Neiman; the fourth cause of action set forth a RICO claim against Neiman.

Local 144 moved for an order confirming the award and directing CNH to comply with it. CNH cross moved for an order dismissing Local 144's motion on the ground that the Interim Award was not final and therefore not subject to judicial confirmation, or, alternatively, that the Arbitrator had exceeded his powers and fashioned an award beyond his authority.

On September 16, 1987, the court granted in part and denied in part both the motion and the cross motion. On November 9, 1987, a judgment was signed dismissing the case pursuant to the opinion of September 16. Local 144 subsequently moved to amend the judgment and to reduce the judgment to a specific dollar amount to be paid into the escrow account. Defendants cross-moved for relief from the judgment on the grounds that new evidence had turned up since the arbitration. The motions were heard on December 16, 1987; the court stayed its direction that CNH pay the specified amount due pending the Arbitrator's Final Award, and reinstated the remaining causes of action. The parties went ahead with discovery.

On January 6, 1988 the Arbitrator conducted further hearings and issued a Final Award. On December 14, 1988, Local 144 filed for an order confirming the Final Award in all respects. On January 23, 1989, Local 144 filed for leave to amend its complaint. On March 30, 1989 Neiman and CNH moved to quash and for a protective order preventing Local 144 from obtaining access to Neiman's financial records. That motion was denied on May 5, 1989. By opinion of May 23, 1989 the Final Award was confirmed to the extent it ordered pay-

ments totaling $8,757,709 plus interest for 1981 to 1985 but vacated as to amounts awarded for 1986 and 1987. Local 144's motion to amend the complaint was granted except for the proposed claim for an accounting. On June 8, 1989 Local 144 filed its first amended complaint.

On July 16, 1989 Local 144 moved to compel discovery in response to the sixth request for documents, and Neiman later moved to quash the subpoena served in connection with the document demand. At a pre-trial conference the parties agreed to defer disposition in view of an anticipated ruling from the Arbitrator in a related matter considered relevant to settlement. On December 27, 1989 Neiman filed his Answer and Counterclaims and Third–Party Complaint ("Third–Party Complaint").

On January 15, 1990 the Arbitrator rendered a decision, and Local 144, at the pre-trial conference of January 24, renewed its request on the pending motions. On February 15, the court granted both motions in part (the "February 15 Order").

On January 19, Local 144 made a motion to dismiss Neiman's Third–Party Complaint and counterclaims and on February 7, 1990 Neiman cross moved for an order pursuant to Rule 14(a) for leave to serve and file the Third–Party Complaint and on March 16, 1990 Neiman moved for reconsideration of the February 15 Order. On May 5, 1990, the court denied Neiman's motion to reconsider the February 15 Order. In an opinion of June 1, 1990, 741 F.Supp. 415 (S.D.N.Y.), the court dismissed Neiman's Third–Party Complaint as well as Neiman's counterclaims based on violations of 42 U.S.C. § 1983, breach of contract and fraud. The court granted Neiman leave to replead the fraud claim.

On June 15, 1990, Neiman filed an amended answer reflecting the court's June 1 opinion. In Neiman's amended answer, he included the alleged § 1983 violations as his sixteenth affirmative defense.

On July 12, 1990, the court denied Neiman's motion on the pleadings dismissing Local 144's fourth and fifth causes of action in the first amended complaint based on common-law fraud and RICO.

On July 16, Neiman moved for summary judgment of Local 144's second and third causes of action, to enforce the arbitration award against Neiman and for equitable subrogation, respectively. Neiman also moved for summary judgment of his first counterclaim for indemnification. Local 144 moved to strike Neiman's sixteenth affirmative defense (the alleged § 1983 violations) and second counterclaim (fraud) and to dismiss the amended answer. On August 31, 1990 Neiman filed a motion for summary judgment on plaintiff's common-law fraud (fourth cause of action) and RICO (fifth cause of action) causes of action. Oral argument on these motions was heard on September 6, 1990.

As Local 144 has withdrawn its third cause of action for equitable subrogation, Plaintiff's Memorandum of Law, n. 1, there remains for consideration before the court on motions for summary judgment on Local 144's cause of action based on enforcement of the arbitration award against Neiman, its action based on RICO, and that based on common-law fraud. Also pending under Rule 56 is Neiman's first counterclaim for indemnification based on the provisions of the 1978 contract between CNH and Local 144. In addition, the court must consider Local 144's motion to strike the sixteenth affirmative defense and second counterclaim and for sanctions pursuant to Rule 11, Fed.R.Civ.P.

## THE FACTS

At issue in this action is the parties' 1981–84 collective bargaining agreement, which governs wages, hours, and working conditions of covered CNH employees represented by Local 144 and its relation to the State's Medicaid reimbursement system.

### 1. The Medicaid Reimbursement System

Under the Medicaid reimbursement system, the State pays health care facilities for caring for patients qualifying for Medicaid benefits. During the period at issue here, approximately 95% of Concourse's patients qualified for Medicaid; Concourse, therefore, received about 95% of its revenues from Medicaid reimbursement.

The State reimburses nursing homes according to a per diem rate for each Medicaid patient day. Until 1986, the State calculated the per diem rate using a cost-based formula. First, the State designated a base year for determining the facility's total reimbursable costs. For example, in 1981 the State selected 1978 as a base year; in 1982 it chose 1980 as the base year. Next, the State calculated the facility's reimbursable base year costs, including labor costs (union and non-union expenses for wages and benefits), operating costs, property costs (rental or mortgage expenses), and so forth. The State did not approve and pay automatically all costs a facility incurred. For example, the State imposed "discrete" ceilings on particular costs, such as salaries paid to administrators and relatives of facility owners. If a facility exceeded the discrete ceiling, the State would exclude the excess from its base year cost calculation.

Once the State had determined the allowable base year costs, it reckoned the reimbursable costs for any given year by multiplying base year costs by a "trend factor" to account for inflation. The State then divided this amount by the facility's total patient days to arrive at the per diem rate.

Within this system, the State allowed for periodic adjustments for specific items. If a facility persuaded the State that it needed additional reimbursement to cover a particular cost, the State would reimburse monies for that item, denoting those particular funds on the rate sheets for the given year. For reimbursement provided in this manner, the facility had to spend the funds for that particular purpose or face recoupment by the State.

In 1982, the State modified the Medicaid reimbursement system by imposing "peer group ceilings." Peer group ceilings reflected a norm determined by comparing total costs at similar facilities. To the extent an individual facility's total costs exceeded the norm, the State denied reimbursement for the excess, and the facility was out of pocket for that amount.

A facility whose costs exceeded the peer group ceilings could appeal to demonstrate that such excess expenditures were necessary to operate properly when, for example, the facility's patients required specialized medical care. If the facility's appeal succeeded, the State would retroactively adjust that facility's reimbursement rate.

On January 1, 1986, the State changed its reimbursement methodology from a cost-based system to a pricing system called "Resource Utilization Group" ("RUGS"). Rather than reimbursing a facility for costs incurred, RUGS essentially set a price the State would pay for a facility to treat a certain type of patient.

2. Parity

When Local 144 first began its representation of workers at Concourse, the workers received wages and benefits on the whole lower than those paid to Local 144's members working at other health care facilities. To remedy the disparity, Local 144 negotiated clauses in its collective bargaining agreements that required Concourse workers' benefits gradually to be brought up to par with those of other workers in the area. In the collective bargaining agreements, this process became known as "parity."

a) The 1978 Agreement

CNH and Local 144 signed their first collective bargaining agreement on August 10, 1978, (the "1978 Agreement"). The 1978 Agreement included the following parity clause:

The difference between the minimum provided for under the Metropolitan Agreement [of Greater New York] and that currently being paid by the Employer shall be implemented during the three year agreement in equal one-third (⅓) installments provided the Cost Review Panel approves increases in rates and the State actually reimburses the Employer to offset all Labor Costs.

On that same day, Neiman incorporated CNH, transferring all stock in the company to his wife to hold in trust for their children. Effective that date, all former employees of Concourse became employees of CNH.

On July 23, 1979, as part of the 1978 agreement, Local 144 entered into an agreement with CNH to protect any principal, officer, or stockholder of CNH in the event that the union might attempt to enforce an arbitral award relating to "fund obligations" against the officers, principals or stock holders of CNH (the "Indemnification Provision"). The Indemnification Provision reads as follows:

In the event the employer fails to make payments pursuant to any of the provisions relating to fund obligations of this agreement then in that event the union may submit to arbitration for such monies then owed by the employer.

In the event it becomes necessary to enforce any award under this provision against the principals, officers, or stockholders of the employer either jointly or individually which shall in any award exceed four months of liability, in the event any such action or actions are commenced, the union shall indemnify and hold the principals, officers or stockholders harmless against any judgement that exceeds 4 months of accrued indebtedness in any separate action. Any payments made hereunder shall be first credited against the liability of the individuals, officers, stockholders and principals.

On December 31, 1980, CNH and Concourse executed a management agreement providing that CNH would make the parity payments. The management agreement stated:

Notwithstanding anything to the contrary in this agreement, no retroactive award of any kind or nature made or awarded against the Corporation [CNH] shall obligate Concourse for payment to the corporation for such award.

Accordingly, any award rendered against CNH Management Associates in favor of its employees would not be enforceable as against Concourse Nursing Home.

### b) The 1981 Agreement

On June 29, 1981, CNH and Local 144 signed their second collective bargaining agreement (the "1981 Agreement") at issue in this action.

Paragraph 1 of the 1981 agreement states:

> To the extent consistent herewith, the aforementioned said collective bargaining agreement [the 1978 Agreement] is entered into for the period commencing May 21, 1981, and continuing up to an including May 1, 1984 with all of the terms and conditions therein contained, except as modified in paragraph "2" hereof.

Paragraph 2 of the 1981 Agreement, setting forth the parity obligation, states:

> CNH agrees that it will achieve parity in accordance with the memorandum of the parties dated August 10, 1978, and paragraph 5 of the memorandum of agreement between the State of New York and other New York Residential Health Care Facilities Association, Inc. [the "Southern Agreement"] or in Accordance with such arrangement more favorable to the employees and employee benefit funds as the State of New York may approve in connection with the implementation of parity as provided in the memorandum between the parties dated August 10, 1978. CNH's only obligation with regard to the funds shall be to make the contributions required to be made to said funds in accordance with the agreement.

Paragraph 5 of the Southern Agreement between CNH's industry group, Southern New York Residential Health Care Facilities Association, Inc. (together with its member institutions) obligated the State to recognize parity pay increases required by the "Turkus Arbitration Award" as allowable costs:

> ... for Medicaid reimbursement purposes at twenty percent (20%) of the *cost* during the first year of the contract, sixty percent (60%) of the *cost* during the second year of the contract and one-hundred percent (100%) of the *cost* during the third year of the contract. There will be no retroactive recognition of parity expenses incurred prior to April 1, 1981 for Medicaid reimbursement purposes. The facility entitled to the above-cited recognition is Concourse Nursing Home (emphasis added).

The 1981 Agreement obligated CNH to provide parity from May 2, 1981 through May 1, 1984, and the parties agreed to continue that obligation through March 31, 1987.

Paragraph 4 of the 1981 Agreement provided:

> Any monies to be paid for economic benefits to be provided by CNH under any of the provisions of paragraphs "1", "2", and/or "3" of this agreement shall only be required to be paid if the State of New York approves such payment and only after the State of New York actually reimburses CNH for all such costs.

### 3. CNH's Reimbursement for Parity

Pursuant to the State's allowance for periodic adjustments described above, Neiman, Concourse's owner, appealed to the State in a letter dated November 17, 1981 for additional reimbursement to fund CNH's 1981–84 contract obligations. On May 3, 1983, the State granted the appeal and issued revised rate sheets from April 1, 1981 through December 31, 1984 that included specific line items for the per diem adjustments for the $26 weekly wage increase and for the cost of providing parity to CNH employees in Local 144's bargaining unit. As the Arbitrator found, by December 31, 1984, Concourse had received a sum of $6,671,731 earmarked for parity payments. The reimbursement amount did not include, nor did the State approve, any parity monies for non-union workers at CNH.

Within thirty days of the State's grant of the parity appeal, Neiman filed a reappeal in accordance with the Department of Health Regulations. The reappeal objected to the change in methodology, whereby the State changed its reimbursement methods from a cost-based system to the pricing system RUGS as described above. In May,

1990, the State responded to the reappeal. The State granted some of the issues which were claimed to be errors in calculation of the rates, but retained the RUGS methodology.

### 4. CNH's Failure to Pay Parity

Although the State purportedly reimbursed Concourse for the parity obligations, Neiman has not yet transferred the funds to CNH, and CNH has not yet fulfilled its parity obligation to Local 144.

In 1985, when the State discovered that Neiman did refused to make parity payments from the monies received through 1983, the State refused to recognize accrued parity obligations as a legitimate cost in the calculation of reimbursement rates for 1986–89 until parity payments were made.

### 5. Neiman's Disposition and Use of the Parity Monies

#### a) Use of Parity Monies Received for 1983

As the Arbitrator found, Concourse had received $3,774,771 in Medicaid funds for parity by December 31, 1983. Of this amount, Neiman claimed that $2,626,043 was available to fulfill CNH's parity obligation from April 1, 1981 to December 31, 1983. According to Neiman, the parity monies must be used to cover other operating costs, including non-union labor.

Between June and December of 1983, $2,183,842 was transferred from Concourse to an escrow account at Manufacturer's Hanover Trust. He subsequently transferred some of this money to several other accounts. Neiman's accountants in Concourse's financial statements and balance sheets termed the several accounts an "escrow account for possible future contingencies" such as retroactive payment of union workers pending the results of arbitration.

Neiman used the funds from this account for, among other things, a $188,178 parity distribution; $167,241 for himself in legal and accounting fees; $178,521 to set up a pension fund; $72,720 in salaries for Neiman's wife; and approximately $102,000 to pay off a bank loan.

#### b) Use of Parity Monies Received in 1984

As stated above, the Arbitrator found Concourse to have received $6,271,240 as reimbursement for parity payments by December 31, 1984. Of this figure, $2,486,569 was the amount received for 1984. Concourse's several escrow accounts during calendar year 1984 showed a balance of $2,387,944. Concourse's and CNH's financial statements state that the total parity monies available as of December 31, 1984 was $1,265,804. Neiman accounted for the reduction of funds available from $2,626,043 in 1983 to $1,265,804 in 1984 on the grounds that the State had undertaken various audits and other retroactive rate reductions for the period 10/15/74 to 12/31/82 which would result in an anticipated recoupment of $200,000.

According to Concourse's 1984 financial statements, Concourse in 1984 disbursed to Neiman loans totalling $457,232, proprietor's drawings totalling $174,169, and legal and accounting fees of $102,502, as well as a salary of $90,400 to his wife.

#### c) Use of Parity Monies Received in 1985

As of December 31, 1985 the several bank accounts had a balance of $2,778,574. During the calendar year 1985 Concourse made the following disbursements, among others: $215,000 to Neiman from the cash escrow account; proprietor's drawings totalling $125,824, legal and accounting fees totalling $179,605, and an increased salary to Neiman's wife of $105,400.

#### d) Use of Parity Monies During 1986

In 1986, Concourse's financial statements eliminated the previously accrued liability of $2,354,963 in parity obligations and treated that amount as a "Due to Medicaid" liability. The Concourse financial statements explained this change as follows:

Parity adjustment was paid to the Nursing Home although CNH has not yet paid it to their employees. Therefore, Nursing Home has not yet paid it to CNH. Nursing Home is currently disputing this issue with Medicaid, not in-

tending to pay it to CNH, and has therefore reclassed the amount as due to Medicaid.

As of December 31, 1986, the cash escrow account had a balance of $2,249,773,-29. During 1986, Concourse paid Neiman legal and accounting fees totalling $118,712 and proprietor's drawing of $173,809, and Neiman's wife received an increased salary of $131,000. At this time, Concourse's loans to Neiman had reached $1,718,827.

*e) Use of Parity Monies During 1987*

In 1987, Concourse loaned Neiman $1,357,882.54 from its cash escrow account. Thus, by December 1987, Concourse had lent Neiman a total of over $3 million over the several years. During 1987, Neiman received $263,775 in proprietor's drawings, and $275,884 in legal and accounting fees; Neiman's wife drew a salary of $121,256.

### 6. The Baine Transaction

In 1984, one Jonathan Baine bought CNH through a purchase of 100% of the shares of CNH from the trust of which Neiman's wife was trustee for a purchase price of $260,000. This figure represented the retained earnings of CNH as of the end of that year and also the amount on CNH's books as due from Concourse. To effect the purchase, the $260,000 was transferred from Concourse's bank account to an account entitled "Marvin Neiman, Helen Neiman escrow account." After the transfer, Neiman and his wife continued to direct the day-to-day operations of CNH. Baine signs the payroll checks from CNH. He receives a $20,000 annual management fee from CNH.

### 7. The Sands Arbitration

The 1981 Agreement designated Professor John E. Sands as an arbitrator (the "Arbitrator"). Pursuant to this provision, the parties submitted the following question to the Arbitrator:

Whether the Employer violated the collective bargaining agreement by failing to pay parity in whole or in part. If so, what shall be the remedy, consistent with the parties' agreement?

At the stipulation of the parties, the Arbitrator made no findings as to the relationship between Neiman, Concourse and CNH. In other words, the Arbitrator's task was to determine the amount, if any, owed the employees, and not who owed them the money.

The Arbitrator conducted 16 days of hearings in New York City from December 1984 to October 1985. At the hearings, both parties were represented by counsel and had the opportunity to adduce evidence, cross-examine each other's witnesses, and argue for their positions. Over the following year, each party submitted proposed findings of fact and conclusions of law, briefs, and reply briefs. Neither party has challenged the validity of these proceedings.

Before the Arbitrator, CNH argued that Paragraph 4 of the 1981 Agreement required it to implement parity only if the State reimbursed it fully for *all* labor costs (union and non-union) including parity. According to CNH's calculations, CNH incurred $11,832,872 in labor costs exclusive of parity between April 1, 1981 and March 31, 1984 and received $12,819,823 in Medicaid reimbursement. Subtracting total labor reimbursement from total labor costs, therefore, left $986,951 available to distribute for parity.

On March 19, 1987, the Arbitrator issued its Interim Award rejecting CNH's interpretation of Paragraph 4 and finding that CNH had violated the 1981 Agreement by failing to pay parity. The Arbitrator granted a fixed dollar remedy for the period ending December 31, 1984 and injunctive relief thereafter. Finding that the minimum amount owed its employees was $6,271,240, and perhaps as much as $6,671,-738, the arbitrator directed: "CNH shall immediately pay the minimum amount due —$6,271,240—plus interest" into an escrow account for final disposition. He also required CNH to continue in effect full parity with master contract wage and benefit levels after December 31, 1984 and retained jurisdiction "to resolve any disputes between the parties concerning interpreta-

tion, computation, and application of [the] Interim Award." Interim Award at 31.

Local 144's attempts to enforce the Interim Award and the Final Award are recounted under "Prior Proceedings" above. On November 4, 1987, CNH learned that neither the State nor the Association had executed the Southern Memorandum paragraph 5 of which the 1981 agreement incorporated and the Arbitrator allegedly relied upon. The State and the Association had instead entered into a different agreement, dated November 12, 1981, which omitted paragraph 5 and made no reference to Concourse. On the basis of this new evidence, CNH moved for relief from judgment of this court and to reopen the arbitration. After hearings, the Arbitrator denied CNH's request to reopen the record and reconsider the Interim Award.

## DISCUSSION

Under Rule 56, a motion for summary judgment shall be granted when the moving party states as a matter of law that he is entitled to that remedy because there are no genuine issues of material fact present in the action. *H.L. Hayden Co. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989). The moving party has the burden of demonstrating the absence of any genuine issues as to all the material facts, and the opposing party is entitled to the benefit of all favorable inferences that may be drawn from the evidence. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444–45 (2d Cir.1980).

1. The Enforcement Action Against Neiman

█ Neiman has moved for summary judgment to dismiss Local 144's enforcement claim against him personally. Local 144's enforcement claim against Neiman raises the question of whether the court can pierce the corporate veil to look beyond the assets of CNH to those of Concourse and Neiman as its sole proprietor. A court will disregard the corporate form where an individual has so dominated a corporation and so disregarded it as a separate entity that the corporation has primarily transact-

ed the domininator's business rather than its own and can be called the dominator's alter ego. *William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 600 (2d Cir.1989).

█ Local 144 has alleged evidence to show common management, common ownership, and overlap of operations between Concourse and CNH. For example, the depositions of Helen Neiman, her brother Henry Teitelbaum, and Jonathan Baine show that even after the incorporation of CNH, Neiman continued to control CNH's labor relations, determining personnel policies, the implementation of wage increases, the award of bonuses, and the payment of arbitral awards. Local 144 also points to Neiman's deposition in which he concedes a lack of an arm's length relationship between CNH and Concourse during the period of negotiation of the labor agreements.

The Union has also questioned the arm's length nature of the 1984 sale of CNH to Jonathan Baine. The depositions show that the consideration for the sale of CNH to Baine was an amount equal to CNH's retained earnings as of December 31, 1983, the total of management fees accrued on CNH's books as due from Concourse over the period from November 1978 to December 1983. This evidence calls into question whether any money actually changed hands in this transaction.

As for evidence of overlap in operations between CNH and Concourse, Local 144 has introduced evidence through depositions that Concourse pays a substantial amount of the operating costs of CNH such as corporate taxes, the cost of annual accounting audits, and attorneys' fees.

Despite Neiman's reading of the case of *Brunswick Corp. v. Waxman,* 599 F.2d 34 (2d Cir.1979), a court can pierce the corporate veil and impose liability on an owner if doing so would achieve an equitable result. *Wrigley,* 890 F.2d at 600. Local 144 has succeeded in raising a question of fact as to whether Neiman did indeed so dominate CNH so as to preclude a grant of summary judgment on Neiman's defense of CNH's separate corporate form.

### 2. The RICO and Common–Law Fraud Claims

■ Neiman has moved for summary judgment to dismiss Local 144's RICO and common-law fraud claims on the ground that there is no evidence in any of the depositions of those who negotiated the 1978 and 1981 Agreements that Neiman fraudulently misrepresented his intention to pay parity to the Union.

Assuming for the purposes of this motion that Local 144 has failed to adduce evidence that would bring into dispute Neiman's assertion that he never made any misrepresentations during the negotiations of the 1978 and 1981 Agreements, Neiman's papers fail to show that there are no disputed issues concerning the *additional* factual bases for the RICO and fraud claims, namely, Neiman's disposition of the parity monies once he began receiving Medicaid reimbursement in 1983.

Local 144 in its papers has adduced evidence from Neiman's accountants' worksheets and Concourse's financial statements which traces the disposition of the parity monies received by Concourse. Neiman has failed to show the absence of a factual dispute as to the disposition of these funds; while Neiman claims that the disposition of funds into escrow accounts was a proper method of holding the funds until the resolution of the dispute with the Union, Local 144 contends that Neiman withdrew this money as loans which were then used to fund personal investments, and as payment to himself and his wife for professional services rendered to Concourse. Viewing the facts in the light most favorable to Local 144 for the purposes of this motion, Local 144 has adduced evidence that rebuts Neiman's contention that there are no issues of material fact relating to Local 144's common-law fraud and RICO claims; whether Neiman diverted the parity monies for his personal use is a question material to both a fraud claim and a RICO claim pursuant to 18 U.S.C. § 1961 *et seq.*

### 3. Neiman's Counterclaim for Indemnification

■ Neiman has also moved for summary judgment on his counterclaim for indem- nification from the Union on the face of the contractual language providing for such indemnification.

In July of 1979, as part of the 1978 Agreement, the parties entered into an agreement known as the "Indemnification Provision." *See* statement of Facts, *supra.* Neiman cites the language of the Indemnification Provision—by which Local 144 agreed to hold harmless any "principal, officer, or shareholder" of CNH, should the Union try to enforce against CNH an award requiring CNH to pay more than four months worth of parity obligations— as grounds for summary judgment.

Local 144 asserts the existence of a question of fact concerning the interpretation of the contract. Local 144 points to language from the 1981 Agreement as support for its assertion that the 1981 Agreement modifies the 1978 Agreement so as to render inapplicable the Indemnity Provision.

Paragraph 1 of the 1981 Agreement contains the relevant language:

> To the extent consistent herewith, the aforementioned said collective bargaining agreement [the 1978 Agreement] is entered into for the period commencing May 21, 1981 and continuing up to and including May 1, 1984 with all of the terms and conditions therein contained, except as modified in paragraph "2" hereof.

Paragraph 2 of the 1981 Agreement contains the Parity Provision. The Parity Provision contained two conditions for the implementation of parity, the State's approval of Neiman's application for reimbursement, and the actual receipt of reimbursement.

According to Local 144, the existence of the above conditions as the only requirements for the implementation of parity preclude the validity of the Indemnity Provision as part of the 1981 Agreement. Otherwise, the argument goes, if the two conditions for parity implementation occur, and Local 144 seeks to enforce the agreement, Local 144 can never receive more than four months' worth of parity monies. Under Neiman's interpretation, Local 144

argues, the Indemnification Provision would render the Parity Provision all but nugatory.

Local 144's interpretation shows that the Indemnification Provision's role in the 1981 Agreement is ambiguous at best. In the face of similar ambiguities concerning the terms of a contract, courts have refused to grant summary judgment motions on the grounds that such ambiguity requires determination of the intent of the parties, a question of fact to be submitted to a jury or other finder of fact. *Metropolitan Life Ins. Co. v. R.J.R. Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990); *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir. 1989) (extent to which later agreement intended to supersede earlier agreement constitutes ambiguity for trier of fact); *Unker v. Joseph Markovits, Inc.*, 643 F.Supp. 1043, 1050 (S.D.N.Y.1986) (oral promises create ambiguity as to interpretation of written provisions); *Ralli v. Tavern on the Green*, 566 F.Supp. 329, 331 (S.D.N.Y.1983) (renewal of part of first contract creates ambiguity as to continuing validity of other term in first contract not specifically renewed). Under these standards, Local 144 has therefore pointed to a factual dispute concerning the Indemnity Provision sufficient to preclude summary judgment on this issue.

4. Neiman's Sixteenth Affirmative Defense

▇ Local 144 has moved to strike Neiman's sixteenth affirmative defense in which Neiman alleges that Local 144 conspired with several State officials in violation of 42 U.S.C. § 1983 to deprive him of the full amount of reimbursement due him. On June 15, 1990, Neiman served an amended answer that included the § 1983 claim as an affirmative defense.

In its opinion of June 1, 1990, this Court dismissed Neiman's § 1983 counterclaim based on the same allegations on the grounds that it was barred by the statute of limitations. In support of its motion, Local 144 argues that, among other things, Rule 15(a), Fed.R.Civ.P., governing the parties' ability to amend pleadings.

Rule 15(a) provides, in pertinent part, that a party may amend his pleading as a matter of course:

at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed on the trial calendar, the party may so amend it at any time within 20 days after it is served.

Neiman served his "Answer, Counterclaims and Third–Party Complaint" on December 22, 1989. Local 144 replied to the first counterclaim and moved for an order dismissing the Third–Party Complaint and remaining counterclaims on January 16, 1990.

Thus, the question arises as to whether Local 144's motion to dismiss the counterclaim constitutes a responsive pleading within the meaning of Rule 15(a). Leaving aside this issue, it is well-settled that statutes of limitations do not normally run against defenses. *Luckenbach Steamship Co. v. United States*, 312 F.2d 545 (2d Cir.1963). Under New York law, moreover, a defense or counterclaim is not barred if:

... if the defense or counterclaim arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends ...

C.P.L.R. § 203(c). The New York statute comports with the opinion cited in *Luckenbach* stating, "the defense of reduction or recoupment which arises out of the same transaction as the note or claim survives as long as the cause of action upon the note or claim survives as long as the cause of action upon the note or claim exists although an affirmative action upon the subject of it may be barred by the statute of limitations". *Luckenbach*, 312 F.2d at 551, quoting *Williams v. Neely*, 134 F. 1 (8th Cir.1904).

Assuming therefore, without deciding, that Neiman may amend his answer as a matter of course pursuant to Rule 15(a), Neiman's affirmative defense based on § 1983 must derive from the same transaction or series of transactions as Local 144's

claim. However, the § 1983 claim does not arise from the same occurrences or transactions as Local 144's claim. Neiman's sixteenth affirmative defense is really a claim against the State officials; the recoupment he is seeking is from the *State,* based on the State's alleged under reimbursement Neiman resulting from the change in reimbursement rates, not from the *Union.* The transaction upon which the Union's claim is based, on the other hand, is the 1981 Agreement between Local 144 and CNH.

Whatever the muddled circumstances of the series of events that led to the signing of the 1981 Agreement, Neiman's sixteenth affirmative defense is not a claim for recoupment against Local 144. Therefore, for the reasons set forth in the court's June 1 opinion, and pursuant to Rule 8(c), Fed.R. Civ.P., Neiman's sixteenth affirmative defense is time-barred.

### 5. Neiman's Second Counterclaim

■ In its opinion dated June 1, 1990, the court gave Neiman the opportunity to replead his fraud counterclaim with sufficient specificity and clarity so that the court could "decipher whether a valid claim is stated against Local 144 and whether the claim would survive the relevant statute of limitations." June 1 Opinion at 424.

Local 144 has moved pursuant to Rule 12(b)(6) to dismiss the second counterclaim as amended. Among the grounds for Local 144's motion is that the counterclaim is time-barred.

The allegations that form the basis for this second counterclaim are essentially the same as those that comprise the § 1983 claim. Neiman alleges that various officials representing Local 144 made certain misrepresentations to Neiman, who was then assisting the Union in its collective bargaining negotiations with CNH. According to Neiman's amended counterclaim, the officials on several occasions, both inside and outside the specific context of the contract negotiations, represented to Neiman that the agreement to be negotiated would be cost-free to CNH, Neiman, and Concourse, because the State would reimburse Concourse for the wage and benefit increases required under the Parity Provi-

sion. Neiman alleges they made this representation without informing him that they knew the State intended to process the labor appeals using a different methodology that would result in a sum that was millions of dollars less than what was required for the payment of the increases to all Local 144 members, members of other unions, and non-union staff.

Under New York Law, the statute of limitations for fraud is six years. C.P.L.R. § 213. The parties disagree on when the claim accrued. Local 144 argues that the claim accrued, at the latest, on May 3, 1983, when the State responded to Neiman's 1981 appeal and sent Neiman the reimbursement rates sheet reflecting the change in methodology. Neiman argues, citing *Barninger v. Nat'l Maritime Union,* 372 F.Supp. 908 (S.D.N.Y.1974), that in some types of cases, a claim accrues not when the plaintiff first knew or had reason to know of the alleged violation, but when he first becomes "entitled to vindicate his individual rights." *Barninger,* 372 F.Supp. at 913. Under this standard, Neiman argues, his claim did not accrue until April of 1987, when Local 144 began this action against Neiman.

However, *Barninger* was an action by employees to enforce a pension plan, and the court in *Barninger* based its decision on the requirement that a pension beneficiary's rights be vested before he can bring an action. Neiman cites to no cases using the *Barninger* method of accrual that are based on common-law fraud. Rather, in this question of accrual, this Court's findings of fact in its June 1 opinion are instructive. In its opinion dismissing Neiman's § 1983 counterclaim, this court found that the § 1983 claim accrued when:

> Neiman knew of his failure to pay parity pursuant to the 1981 Agreement, based upon the failure of the counterclaim defendants to perform on their representations. CNH failed to pay the first raise in 1981; it was certainly apparent to Neiman, whether or not he was a party in the prior actions, by 1982 and 1983 during the arbitration, that the injuries arose about which he now counterclaims.

June 1 Opinion, at 422. As Neiman's fraud claim against the Union is based on the

same alleged misrepresentations as constituted the § 1983 claim against the State and the Union, and the same rule of accrual, i.e., the time of discovery of the injury, applies in this action pursuant to CPLR 213(8), as in the § 1983 action pursuant to federal law, the point of accrual of both claims is the same: in 1981. As the claim accrued in 1981, more than nine years ago, it is therefore time-barred.

6. Rule 11 Sanctions

Local 144 has also moved for sanctions to be imposed against Neiman pursuant to Rule 11, Fed.R.Civ.P. Rule 11 requires an attorney to make a "reasonable inquiry" to determine that pleadings and motions are "well grounded in fact" and "warranted by existing law" or constitute "a good faith argument for the extension, modification, or reversal of existing law," and that they are not interposed for the purpose of harassment or delay. According to the Court of Appeals for the Second Circuit:

> If the inquiry was objectively reasonable under the circumstances and disclosed a reasonable factual basis for the claim, then sanctions are not appropriate. On the other hand, if the attorney either failed to make an objectively reasonable inquiry or pursued a claim for which no basis was disclosed by such an inquiry, then sanctions are appropriate.

*Calloway v. The Marvel Entertainment Group*, 854 F.2d 1452, 1470 (2d Cir.1988), *rev'd in part, Pavelic & LeFlore v. The Marvel Entertainment Group*, — U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

 As this Court in its June 1 opinion gave Neiman leave to amend his counterclaim based on fraud, the amended counterclaim does not fall within the meaning of claims interposed for the purpose of harassment or delay. Nor does Neiman's sixteenth affirmative defense quite reach the threshold required by the Second Circuit that it be "patently clear that the claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify, or reverse the law as it stands ...". *Eastway Const. Corp. v. New York*, 762 F.2d 243, 254 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98

L.Ed.2d 226 (1987). While this Court did dismiss Neiman's § 1983 counterclaim in its opinion of June 1, Neiman supported his attempt to renew the claim as an affirmative defense with a legal argument, which, though not accepted by this court, he had some reason to assert. Dismissal of a complaint does not in and of itself give rise to a Rule 11 Sanction. *See id.* at 252–54.

CONCLUSION

For the reasons set forth above, Neiman's motions for summary judgment on the enforcement action against him, and on the RICO and common-law fraud claims are denied. Neiman's motion for summary judgment on his indemnification claim is also denied. Local 144's motion to strike Neiman's sixteenth affirmative defense and Neiman's second counterclaim based on common-law fraud is granted. The motion for Rule 11 sanctions is denied.

It is so ordered.